[No. S072583. Dec. 2, 1999.]

ADRIAN BROUGHTON, JR., a Minor, etc., et al., Plaintiffs and Respondents, v.
CIGNA HEALTHPLANS OF CALIFORNIA, Defendant and Appellant.

1070

COUNSEL

Horvitz & Levy, Daniel J. Gonzalez, Lisa Perrochet; Hammond, Zuetel & Cahill, Zuetel & Cahill, Zuetel & Tomlinson, Kenneth R. Zuetel, Jr., and Cynthia L. K. Steel for Defendant and Appellant.

Fred J. Hiestand for the Association for California Tort Reform as Amicus Curiae on behalf of Defendant and Appellant.

Thelen Reid & Priest, Curtis A. Cole and Nicole M. Duckett for California Medical Association, California Dental Association and California Health-care Association as Amici Curiae on behalf of Defendant and Appellant.

Arnold & Porter, Lawrence A. Cox, Brian K. Condon and Kurt Fritz for Kaiser Foundation Health Plan, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

O'Melveny & Myers, Martin S. Checov and George C. Demos for the California Association of Health Plans as Amicus Curiae on behalf of Defendant and Appellant.

Mazursky, Schwartz & Angelo, Christopher E. Angelo, Anthony Kornarens; Watkins & Stevens and Steven B. Stevens for Plaintiffs and Respondents.

The Alexander Law Firm and Richard Alexander for American Association of Retired Persons as Amicus Curiae on behalf of Plaintiffs and Respondents.

Simon, Kesner & Friedman and Douglas E. Friedman for the American Cancer Society and the Autism Society of America as Amici Curiae on behalf of Plaintiffs and Respondents.

Ed Howard for Consumers for Quality Care as Amicus Curiae on behalf of Plaintiffs and Respondents.

The Sturdevant Law Firm, James C. Sturdevant, Jack P. Hug, Steven S. Kaufhold; Ian Herzog; Bruce Broillet; David S. Casey, Jr.; Deborah David; Douglas Devries; Laurence E. Drivon; Thor Emblem; Joseph F. Harbison III; Steven J. Kleifield; Moses Lebovits; Harvey R. Levine; Wayne McLean; David A. Rosen; Leonard Sacks; Rick Simons; Daniel Smith; Chris Spagnoli; Robert B. Steinberg; Thomas G. Stolpman; Tony Tanke; Lea-Ann Tratten; William D. Turley; and Roland Wrinkle for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Respondents.

Paul Bland; Victoria Nugent; and Sarah Posner for Trial Lawyers for Public Justice as Amicus Curiae on behalf of Plaintiffs and Respondents.

Patricia Sturdevant for National Association of Consumer Advocates as Amicus Curiae on behalf of Plaintiffs and Respondents.

Mark Mandell; Mary Alexander; and John Vail for Association of Trial Lawyers of America as Amicus Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**MOSK, J.**—In this case we consider whether a claim brought under the Consumers Legal Remedies Acts, Civil Code section 1750 et seq. (CLRA or the Act), may be subject to arbitration. The Court of Appeal concluded that such a claim would not be arbitrable, principally because the CLRA authorizes permanent injunctive relief to enjoin deceptive business practices, and such a remedy is beyond the scope of an arbitrator to grant or properly enforce. We conclude that the Court of Appeal is partially correct that the injunctive relief portion of a CLRA claim is inarbitrable, although for reasons somewhat different from those found by the Court of Appeal. But we also conclude that an action for damages under the CLRA is fully arbitrable and should be severed from an injunctive relief action when, as here, a plaintiff requests both types of relief.

### I. STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

Plaintiffs are a minor, Adrian Broughton, Jr., through his guardian ad litem, Keya Johnson (his mother), and Ms. Johnson on her own behalf. Adrian and his mother were covered by Medi-Cal, which had negotiated a contract with Cigna Healthplans of California (Cigna) for health care coverage. The first cause of action in the complaint against Cigna and others, not parties to the appeal, seeks damages for medical malpractice, based on severe injuries claimed to have been suffered by Adrian at birth. The second cause of action alleges violation of the CLRA, based on allegations that Cigna deceptively and misleadingly advertised the quality of medical services which would be provided under its health care plan. Specifically, plaintiffs allege that Ms. Johnson received substandard prenatal medical services, and that she was denied a medically necessary cesarean delivery. Under the second cause of action plaintiffs ask for actual damages, punitive damages, attorneys fees and "an order enjoining [Cigna's] deceptive methods, acts, and practices."

Cigna answered the complaint and filed a combined motion to compel arbitration and verified petition for an order requiring plaintiffs to arbitrate the controversy. Cigna relied on the mandatory arbitration provision in its combined evidence of coverage and disclosure form.

Plaintiffs opposed the motion. They argued that there was no evidence of an agreement to arbitrate between them and Cigna, the case did not come within the statutes governing arbitration of medical malpractice claims, Cigna waived the right to arbitrate by litigating motions before the trial court, and the second cause of action under the CLRA was not subject to arbitration. In support of the last argument, plaintiffs cited Civil Code section 1751,[1] a part of the Act: "Any waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void."

The trial court severed the causes of action and granted the motion to compel arbitration of the medical malpractice cause of action, but denied the motion as to the cause of action under the CLRA. Cigna filed a timely notice of appeal from the order denying its motion to compel arbitration of the second cause of action for violation of the CLRA.

The Court of Appeal affirmed the trial court's judgment. It pointed to the CLRA antiwaiver provision and to the fact that the statute authorizes the granting of permanent injunctions against deceptive business practices. The court reasoned, as explained at greater length below, that arbitrators may not issue permanent injunctions, and therefore arbitration is not an adequate forum for the resolution of CLRA claims. We granted review to decide whether CLRA claims are arbitrable, and we also requested the parties to address the question whether a conclusion that an agreement to arbitrate CLRA claims is unenforceable would run afoul of the Federal Arbitration Act (9 U.S.C. § 1 et seq. (FAA)).[2]

## II. Discussion

We begin our discussion by recapitulating the federal statutory mandate and strong public policy in favor of enforcing arbitration agreements. Section 2 of the FAA provides: "A written provision in . . . a contract evidencing a transaction involving [interstate] commerce to settle by arbitration the

---

[1] All statutory references are to the Civil Code unless otherwise indicated.

[2] In limiting the issues on which we granted review, we have not considered an issue plaintiffs raised below: whether the government can, on behalf of Medi-Cal recipients, agree to arbitration and waive the recipients' right to a jury trial as a condition of receiving Medi-Cal benefits. Nor do we address plaintiffs' contention that the arbitration agreement at issue in this case applied only to medical malpractice claims and not CLRA claims. These issues may be raised as appropriate in subsequent proceedings.

controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.)

The FAA, and section 2 in particular, "was intended to 'revers[e] centuries of judicial hostility to arbitration agreements,' [citation] by 'plac[ing] arbitration agreements "upon the same footing as other contracts." ' " (*Shearson/American Express, Inc.* v. *McMahon* (1987) 482 U.S. 220, 225-226 [107 S.Ct. 2332, 2337, 96 L.Ed.2d 185] (*McMahon*).) Through the FAA, "Congress precluded States from singling out arbitration provisions for suspect status . . . ." (*Doctor's Associates, Inc.* v. *Casarotto* (1996) 517 U.S. 681, 687 [116 S.Ct. 1652, 1656, 134 L.Ed.2d 902] [striking down state law requiring special notice for arbitration provisions in contracts].) California has a similar statute (Code Civ. Proc., § 1281) and a similar policy in favor of arbitration. (*Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1, 9-10 [10 Cal.Rptr.2d 183, 832 P.2d 899] (*Moncharsh*).)

Over the past 15 years, the United States Supreme Court has on numerous occasions invalidated laws and judicial decisions that disfavored arbitration. The seminal case of *Southland Corp.* v. *Keating* (1984) 465 U.S. 1 [104 S.Ct. 852, 79 L.Ed.2d 1] (*Southland*) reversed one of our own cases. We had decided in *Keating* v. *Superior Court* (1982) 31 Cal.3d 584 [183 Cal.Rptr. 360, 645 P.2d 1192] (*Keating*) that certain claims under California's Franchise Investment Law (Corp. Code, § 31000 et seq.) were not subject to mandatory arbitration pursuant to a provision in a franchise agreement. The Franchise Investment Law had an antiwaiver provision similar to the one in this case, which we construed as an expression of a legislative intent to limit enforcement of the statute to the courts rather than arbitration. This limitation was warranted, we reasoned, because "the effectiveness of the statute 'is lessened in arbitration as compared to judicial proceedings' [citation] in part because of the limited nature of judicial review [citation]." (*Keating, supra,* 31 Cal.3d at p. 596.) The United States Supreme Court held that the Franchise Investment Law, so interpreted, violated the FAA. As the court stated: "In enacting § 2 of the [FAA], Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." (*Southland, supra,* 465 U.S. at p. 10 [104 S.Ct. at p. 858].)

In *Perry* v. *Thomas* (1987) 482 U.S. 483 [107 S.Ct. 2520, 96 L.Ed.2d 426], the high court held California Labor Code section 229, which insulated claims regarding the collection of wages from agreements to arbitrate, was preempted by section 2 of the FAA. As the court explained: "An agreement to arbitrate is valid, irrevocable, and enforceable, *as a matter of federal law,*

[citation] 'save upon such grounds as exist at law or in equity for the revocation of *any* contract.' 9 U. S. C. § 2. . . . Thus state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2. [Citations.] A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law." (*Perry* v. *Thomas, supra,* 482 U.S. at pp. 492-493, fn. 9 [107 S.Ct. at p. 2527].)

■ Since *Southland* and *Perry,* the court has repeatedly made clear that arbitration may resolve statutory claims as well as those purely contractual if the parties so intend, and that in doing so, the parties do not forego substantive rights, but merely agree to resolve them in a different forum. (*Mitsubishi Motors* v. *Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 627 [105 S.Ct. 3346, 3354, 87 L.Ed.2d 444] (*Mitsubishi Motors*) [claims regarding federal antitrust statutes subject to arbitration]; *McMahon, supra,* 482 U.S. 220 [Securities Exchange Act of 1934 and Racketeer Influenced and Corrupt Organizations Act claims subject to arbitration]; *Rodriguez de Quijas* v. *Shearson/Am. Exp.* (1989) 490 U.S. 477 [109 S.Ct. 1917, 104 L.Ed.2d 526] [claims arising from Securities Act of 1933 arbitrable, overruling previous construction of the antiwaiver provisions of that act in *Wilko* v. *Swan* (1953) 346 U.S. 427 [74 S.Ct. 182, 98 L.Ed. 168]]; *Gilmer* v. *Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20 [111 S.Ct. 1647, 114 L.Ed.2d 26] (*Gilmer*) [Age Discrimination in Employment Act (ADEA) claim arbitrable].)

Notwithstanding all of the above, the United States Supreme Court has acknowledged that "not . . . all controversies implicating statutory rights are suitable for arbitration." (*Mitsubishi Motors, supra,* 473 U.S. at p. 627 [105 S.Ct. at p. 3354].) The unsuitability of a statutory claim for arbitration turns on congressional intent, which can be discovered in the text of the statute in question, its legislative history or in an " 'inherent conflict' between arbitration and the [statute's] underlying purposes." (*Gilmer, supra,* 500 U.S. at p. 26 [111 S.Ct. at p. 1652].) Although the court has not elaborated on the phrase "inherent conflict," two cases shed light on its meaning.

In *Mitsubishi Motors, supra,* 473 U.S. 614, the court considered, within the context of enforcement of an international agreement, whether statutory antitrust claims are subject to arbitration. The court rejected the argument

articulated in that case by the Court of Appeals that the claim was not arbitrable because " ' "[a] claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest." ' [Citation.]" (*Id.* at p. 635 [105 S.Ct. at p. 3358].) The court stated: "The treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators. [Citation.] [¶] The importance of the private damages remedy, however, does not compel the conclusion that it may not be sought outside an American court. Notwithstanding its important incidental policing function, the treble-damages cause of action conferred on private parties by § 4 of the Clayton Act, 15 U. S. C. § 15, . . . *seeks primarily to enable an injured competitor to gain compensation for that injury.* [¶] '. . . Of course, treble damages also play an important role in penalizing wrongdoers and deterring wrongdoing, as we also have frequently observed. . . . It nevertheless is true that the treble-damages provision, which makes awards available only to injured parties, and measures the awards by a multiple of the injury actually proved, is designed primarily as a remedy.' " (*Id.* at pp. 635-636 [105 S.Ct. at p. 3358], italics added.)

In *McMahon, supra,* 482 U.S. 220, the court considered a similar argument with respect to the Racketeer Influenced and Corrupt Organizations Act (RICO). The plaintiffs in that case, who brought various federal and state claims against a brokerage firm, had argued that "the public interest in the enforcement of RICO precludes its submission to arbitration." (*Id.* at p. 240 [107 S.Ct. at p. 2344].) The court, after citing *Mitsubishi Motors,* stated: "RICO's drafters . . . sought to provide vigorous incentives for plaintiffs to pursue RICO claims that would advance society's fight against organized crime. [Citation.] But in fact RICO actions are seldom asserted 'against the archetypal, intimidating mobster.' [Citations] ('[O]nly 9% of all civil RICO cases have involved allegations of criminal activity normally associated with professional criminals'). The special incentives necessary to encourage civil enforcement actions against organized crime do not support nonarbitrability of run-of-the-mill civil RICO claims brought against legitimate enterprises. The private attorney general role for the typical RICO plaintiff is simply less plausible than it is for the typical antitrust plaintiff, and does not support a finding that there is an irreconcilable conflict between arbitration and enforcement of the RICO statute." (*Id.* at pp. 241-242 [107 S.Ct. at p. 2345].)

The *Mitsubishi Motors* and *McMahon* courts' rejection of what may be termed the "public interest" argument in the above cases revolves around the essentially private nature of the damages remedy at issue—the public benefits of the antitrust and civil RICO suit are merely incidental to the pursuit

of a private remedy, making the "private attorney general role" for such plaintiffs relatively "implausible." The above passages imply, however, that when the primary purpose and effect of a statutory remedy is not to compensate for an individual wrong but to prohibit and enjoin conduct injurious to the general public, i.e., when the plaintiff is acting authentically as a private attorney general, such a remedy may be inherently incompatible with arbitration.

Is there an inherent conflict between arbitration and the CLRA? In order to answer that question, we first look to the nature and purpose of that statute. The CLRA was enacted in an attempt to alleviate social and economic problems stemming from deceptive business practices, which were identified in the 1969 Report of the National Advisory Commission on Civil Disorders (i.e., the Kerner Commission). (See Reed, *Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act* (1971) 2 Pacific L.J. 1, 5-7.) Section 1760 contains an express statement of legislative intent: "This title shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."

Specifically, the CLRA identifies as actionable certain deceptive business practices. (§ 1770.) The practices include, for example, "[r]epresenting that goods are original or new if they have deteriorated unreasonably or are altered, reconditioned, reclaimed, used, or secondhand" (§ 1770, subd. (a)(6)) or "[a]dvertising goods or services with intent not to sell them as advertised" (§ 1770, subd. (a)(9)). It permits a consumer who has been damaged by these deceptive practices to bring an action for actual damages, including a class action suit, as well as for "an order enjoining a method, act, or practice," and punitive damages. (§ 1780, subd. (a).) The court is also mandated to award the prevailing plaintiff court costs and attorneys fees, and reasonable attorneys fees to the prevailing defendant upon a finding that a plaintiff's prosecution was not in good faith. (§ 1780, subd. (d).) The statute further provides that its remedies are "not exclusive" but rather "in addition to any other procedures or remedies . . . in any other law." (§ 1752.) And as mentioned, the Act also expressly provides that its protections may not be waived by the consumer. (§ 1751.)

 In deciding whether CLRA claims are arbitrable, we first dispose of plaintiffs' contention that section 2 of the FAA does not apply to their agreement with Cigna because the terms of that agreement purport to incorporate the rules of the California Arbitration Act (Code Civ. Proc., § 1280 et seq.), citing *Volt Info. Sciences* v. *Leland Stanford Jr. U.* (1989) 489 U.S. 468 [109 S.Ct. 1248, 103 L.Ed.2d 488]. We disagree.

Even assuming arguendo that California's statute embodies a less strict standard for enforcing arbitration agreements than does the FAA, section 2 of the FAA applies regardless of which law the arbitration agreement incorporates. As the court recently stated in *Doctors Associates, Inc. v. Casarotto, supra,* 517 U.S. at page 688 [116 S.Ct. at pages 1656-1657]: "*Volt* involved an arbitration agreement that incorporated state procedural rules, one of which, on the facts of that case, called for arbitration to be stayed pending the resolution of a related judicial proceeding [unlike section 4 of the FAA, which would not permit such a stay]. The state rule examined in *Volt* determined only the efficient order of proceedings; it did not affect *the enforceability of the arbitration agreement itself.* We held that applying the state rule would not 'undermine the goals and policies of the FAA,' [citation], because the very purpose of the Act was to 'ensur[e] that private agreements to arbitrate are enforced according to their terms . . . .' " (Italics added.) The *Doctors Associates* court struck down a state law that did affect the enforceability of arbitration agreements by requiring special notice for arbitration provisions in contracts, because the law "singl[ed] out arbitration provisions for suspect status." (*Doctors Associates, Inc. v. Casarotto, supra,* 517 U.S. at p. 687 [116 S.Ct. at p. 1656].) As *Doctors Associates* makes clear, *Volt, supra,* 489 U.S. 468, did not alter the rule that states may not disfavor arbitration agreements, whether those agreements explicitly incorporate the provisions of the FAA or some other arbitration regime.[3] ██ ▬ ▬ The policy favoring enforcement of arbitration agreements embodied in section 2 of the FAA fully applies in this case provided, as discussed below, that the parties to the arbitration were in a transaction involving interstate commerce.[4]

██ Plaintiffs' main arguments that CLRA claims are not suitable for arbitration revolve around the Act's injunctive relief provision. As noted, they sought injunctive relief as well as damages in their CLRA claim. Following the Court of Appeal, they argue that they cannot "vindicate [their CLRA claim] in the arbitral forum" because of an arbitrator's supposed lack of authority to grant permanent injunctive relief.

[3]Of course, parties may conceivably enter into an arbitration agreement that provides a different standard of enforceability than that found in section 2 of the FAA. There is no indication in the present case that the parties have done so.

[4]Plaintiffs also claim the FAA preemption issue was raised for the first time in the petition for review and not in the courts below, and is therefore not properly before this court. But as Cigna points out, the issue was not raised by the trial court's ruling, which merely held that the agreement between Broughton and Cigna did not encompass the arbitration of CLRA claims. The Court of Appeal, on the other hand, held that the CLRA itself precludes arbitration, which directly raises the issue of FAA preemption, although neither the Court of Appeal nor the parties addressed that issue. This court is empowered to decide issues necessary for the proper resolution of the case before it, whether or not raised in the courts below. (See Cal. Rules of Court, rule 29.2(a); *Cedars-Sinai Medical Center* v. *Superior Court* (1998) 18 Cal.4th 1, 6 [74 Cal.Rptr.2d 248, 954 P.2d 511].)

Plaintiffs contend that arbitrators may not issue permanent injunctions principally because an arbitrator has no authority to vacate or modify an injunction. They correctly point out that a superior court has the power "to modify or vacate its [injunctive] decree when the ends of justice will be thereby served," notwithstanding the rule regarding finality of judgments. (*Sontag Chain Stores Co.* v. *Superior Court* (1941) 18 Cal.2d 92, 95 [113 P.2d 689].) "Such a decree, it has uniformly been held, is always subject, upon a proper showing, to modification or dissolution by the court which rendered it. The court's power in this respect is an inherent one." (*Id.* at pp. 94-95.) Grounds for modification or dissolution include supervening changes in fact or law. (See *Welsch* v. *Goswick* (1982) 130 Cal.App.3d 398, 404-405 [181 Cal.Rptr. 703].) Plaintiffs argue that arbitrators have no comparable authority because they lose all ability to correct or otherwise modify arbitration awards 30 days after service of the award. (Code Civ. Proc., § 1284.) Plaintiffs also contend that the superior court is without statutory authority to modify or dissolve an arbitral injunction, being confined to review an arbitration award on a narrow basis at the time it is petitioned to confirm the award. (*Id.*, § 1286.2; *Moncharsh, supra*, 3 Cal.4th at p. 11.)

Plaintiffs cite *Marsch* v. *Williams* (1994) 23 Cal.App.4th 238 [28 Cal.Rptr.2d 402] in support of their position. In that case the court held that an arbitrator had no authority to appoint a receiver, in part because of the critical role the superior court plays in supervising receivers (*id.* at p. 248), and plaintiffs claim the superior court must play a similar supervisorial role vis-à-vis permanent injunctions. Plaintiffs also argue that the fact that arbitrators are without authority to enforce their own injunctions (see *Luster* v. *Collins* (1993) 15 Cal.App.4th 1338, 1349 [19 Cal.Rptr.2d 215]) makes such injunctions unworkable.

Cigna disagrees, citing *Swan Magnetics, Inc.* v. *Superior Court* (1997) 56 Cal.App.4th 1504 [66 Cal.Rptr.2d 541]. That case concerned whether a trial court had the authority to modify an arbitrator's injunction prohibiting the manufacture of a product in contravention of a licensing agreement. The *Swan* court concluded that an arbitrator's injunction, like a superior court injunction, is inherently subject to modification or vacation. (*Id.* at p. 1510.) The *Swan* court envisioned the modification or vacation occurring through the initiation of a new arbitration proceeding. (*Id.* at pp. 1511-1512.)

We need not decide the broad question framed by the Court of Appeal and by plaintiffs as to whether an arbitrator may ever issue a permanent injunction. We conclude on narrower grounds that the injunction plaintiffs seek in the present case is indeed beyond the arbitrator's power to grant. The CLRA plaintiff in this case is functioning as a private attorney general, enjoining

future deceptive practices on behalf of the general public. We hold that under such circumstances arbitration is not a suitable forum, and the Legislature did not intend this type of injunctive relief to be arbitrated.

Our path to that conclusion begins by recalling that the purpose of arbitration is to voluntarily resolve private disputes in an expeditious and efficient manner. (See *Moncharsh, supra,* 3 Cal.4th at pp. 10-11; *Dean Witter Reynolds Inc.* v. *Byrd* (1985) 470 U.S. 213, 221 [105 S.Ct. 1238, 1242-1243, 84 L.Ed.2d 158].) Parties to arbitration voluntarily trade the formal procedures and the opportunity for greater discovery and appellate review for " 'the simplicity, informality, and expedition of arbitration.' " (*Gilmer, supra,* 500 U.S. at p. 31 [111 S.Ct. at p. 1655]; see also *Moncharsh, supra,* 3 Cal.4th at pp. 11-12.)

On the other hand, the evident purpose of the injunctive relief provision of the CLRA is not to resolve a private dispute but to remedy a public wrong. Whatever the individual motive of the party requesting injunctive relief, the benefits of granting injunctive relief by and large do not accrue to that party, but to the general public in danger of being victimized by the same deceptive practices as the plaintiff suffered. In this important respect, the injunctive relief at issue in this case differs from the antitrust treble damages remedy considered in *Mitsubishi Motors, supra,* 473 U.S. at pages 635-636 [105 S.Ct. at pages 3358-3359], in which any public benefit was merely incidental to private compensation.[5] In other words, the plaintiff in a CLRA damages action is playing the role of a bona fide private attorney general. (*McMahon, supra,* 482 U.S. at pp. 241-242 [107 S.Ct. at p. 2345-2346].)

---

[5]It is true, of course, that many injunctions will have effects beyond the parties themselves. For example, an injunction in the copyright field will prevent certain parties from selling products to third parties. (See, e.g., *Saturday Evening Post Co.* v. *Rumbleseat Press, Inc.* (7th Cir. 1987) 816 F.2d 1191, 1198-1199 [preventing copyright infringement]; *Kamakazi Music Corp.* v. *Robbins Music Corp.* (2d Cir. 1982) 684 F.2d 228, 229, 231) [same]; see also *General Dy. Corp.* v. *Local 5, Ind. U. of Marine, etc.* (1st Cir. 1972) 469 F.2d 848, 850 [approving arbitrator's award enjoining employees from violating no-strike clause]; *Sprinzen* v. *Nomberg* (1979) 46 N.Y.2d 623, 631 [415 N.Y.S.2d 974, 389 N.E.2d 456] [approving arbitrator's award enforcing restrictive employment covenant].) In *Advanced Micro Devices, Inc.* v. *Intel Corp.* (1994) 9 Cal.4th 362, 381 [36 Cal.Rptr.2d 581, 885 P.2d 994], we upheld an arbitrator's grant and extension of certain licensing agreements that doubtless would have some effect on third parties. But in all the cases cited above, the effects of the arbitrator's decision on third parties were incidental to the primary purpose of resolving a conflict between the parties and rectifying individual wrongs. We do not decide if these types of injunctions are arbitrable.

In the present case, however, plaintiffs asked for an injunction against Cigna's "deceptive methods, acts, and practices," an injunction that will obviously not benefit them directly, since they have already been injured, allegedly, by such practices and are aware of them. Moreover, even if a CLRA plaintiff stands to benefit from an injunction against a deceptive business practice, it appears likely that the benefit would be incidental to the general public benefit of enjoining such a practice. Unlike an antitrust treble damages award, for example, where the plaintiff is the primary beneficiary of such an award and the public only indirectly benefited by its deterrent value, in the case of a CLRA injunction the public is generally

In addition to the fact that the injunction is for the public benefit, we are cognizant of the evident institutional shortcomings of private arbitration in the field of such public injunctions. Even those courts that have generally affirmed the ability of arbitrators to issue injunctions acknowledge that the modification or vacation of such injunctions involves the cumbersome process of initiating a new arbitration proceeding. (See *Swan Magnetics, Inc.* v. *Superior Court, supra,* 56 Cal.App.4th at pp. 1511-1512.) While these procedures may be acceptable when all that is at stake is a private dispute by parties who voluntarily embarked on arbitration aware of the trade-offs to be made, in the case of a public injunction, the situation is far more problematic. The continuing jurisdiction of the superior court over public injunctions, and its ongoing capacity to reassess the balance between the public interest and private rights as changing circumstances dictate, are important to ensuring the efficacy of such injunctions. In some cases, the continuing supervision of an injunction is a matter of considerable complexity. (See, e.g., *Board of Ed. of Oklahoma City* v. *Dowell* (1991) 498 U.S. 237 [111 S.Ct. 630, 112 L.Ed.2d 715] [regarding dissolution of a long-standing desegregation decree].) Indeed, in such cases, judges may assume quasi-executive functions of public administration that expand far beyond the resolution of private disputes. (*Ibid.*) Arbitrators, on the other hand, in addition to being unconstrained by judicial review, are not necessarily bound by earlier decisions of other arbitrators in the same case. Thus, a superior court that retains its jurisdiction over a public injunction until it is dissolved provides a necessary continuity and consistency for which a series of arbitrators is an inadequate substitute.

Furthermore, we recently held that an arbitration award does not have collateral estoppel effect in favor of nonparties to an arbitration unless the arbitral parties so agree. (*Vandenberg* v. *Superior Court* (1999) 21 Cal.4th 815, 836-837 [88 Cal.Rptr.2d 366, 982 P.2d 229].) Thus, if an arbitrator issued an injunction under the CLRA prohibiting a certain deceptive practice, and if that injunction were imperfectly enforced, another consumer plaintiff also seeking to enjoin the practice would have to relitigate it. In other words, only the parties to the injunction would be able to enforce it, although the injunction is public in scope. Therefore, an arbitral injunction would be more difficult to enforce, and would be a less effective means of achieving the CLRA's goal of enjoining deceptive business practices.

Moreover, it hardly requires elaboration that superior court judges are accountable to the public in ways arbitrators are not. Superior court judges

benefited directly by the elimination of deceptive practices, and the plaintiff benefited, if at all, only by virtue of being a member of the public. Thus, we disagree with the concurring and dissenting opinion that the public benefit of a CLRA injunction is "only incidental (or, at best, complementary) to providing the CLRA plaintiff with a complete remedy." (Conc. and dis. opn., *post*, at p. 1100.) We do not decide the hypothetical case of the CLRA plaintiff whose injunctive relief claim stands to benefit him or her uniquely without public benefit.

are constitutional officers (Cal. Const., art. VI, § 4) who are sworn to uphold the United States and California Constitutions (*id.*, art. XX, § 3). They are locally elected (*id.*, art. VI, § 16, subd. (b)) and may be recalled (*id.*, art. II, § 14, subd. (b)). They are subject to discipline by a public body, the Commission on Judicial Performance. (*Id.*, art. VI, § 18.) Virtually all of their proceedings take place in public view. (See *NBC Subsidiary (KNBC-TV), Inc.* v. *Superior Court* (1999) 20 Cal.4th 1178 [86 Cal.Rptr.2d 778, 980 P.2d 337].) Their decisions are subject to appellate review. By contrast, arbitrators are not public officers and are in no way publicly accountable. Their proceedings take place in private. They are subject to minimal appellate review. (*Moncharsh, supra,* 3 Cal.4th at p. 11.) There can be little doubt that publicly accountable judges, rather than arbitrators, are the most appropriate overseers of injunctive remedies explicitly designed for public protection.

In short, there are two factors taken in combination that make for an "inherent conflict" between arbitration and the underlying purpose of the CLRA's injunctive relief remedy. First, that relief is for the benefit of the general public rather than the party bringing the action. (*Mitsubishi Motors, supra,* 473 U.S. at pp. 635-636 [105 S.Ct. at pp. 3358-3359]; *McMahon, supra,* 482 U.S. at pp. 241-242 [107 S.Ct. at pp. 2345-2346].) Second, the judicial forum has significant institutional advantages over arbitration in administering a public injunctive remedy, which as a consequence will likely lead to the diminution or frustration of the public benefit if the remedy is entrusted to arbitrators. Given this inherent conflict, we will presume, absent indications to the contrary, that the Legislature did not intend that the injunctive relief claims be arbitrated. (See *Gilmer, supra,* 500 U.S. at p. 26 [111 S.Ct. at p. 1652].)[6] We discern no such indications in this case, and indeed, the language of the statute suggests the contrary. ██ ██ Section 1780, subdivision (c) prescribes that the CLRA action be filed in "any *court . . .* having jurisdiction of the subject matter." (Italics added.)[7]

 Nor do we believe that this interpretation of the CLRA contravenes the FAA. As discussed, the United States Supreme Court recognizes an

---

[6]As the concurring and dissenting opinion points out, a CLRA claim, like the antitrust claim at issue in *Mitsubishi Motors,* "remains at all times under the control of the individual litigant" and "no citizen is under an obligation to bring" such an action, nor does the CLRA plaintiff require "executive or judicial approval" before settling a CLRA claim. (*Mitsubishi Motors, supra,* 473 U.S. at p. 636 [105 S.Ct. at p. 3359].) But once the consumer brings an injunctive relief action under the CLRA, the fashioning and continuing supervision of such relief by a private arbitrator conflicts with the public protective purpose inherent in the Act for the reasons stated above.

[7]The concurring and dissenting opinion argues that Code of Civil Procedure section 1281.2 mandates the enforcement of arbitration agreements subject only to the statutory exceptions listed therein. We disagree. Rather, we agree with the United States Supreme Court, as cited above, that a legislative body may express its intention to make a statutory right inarbitrable not only explicitly, but also implicitly in those rare circumstances in which the fulfillment of the statutory purpose inherently conflicts with arbitration.

"inherent conflict" exception to the arbitrability of federal statutory claims. (*Gilmer, supra,* 500 U.S. at p. 26 [111 S.Ct. at p. 1652].) The discussion in *Gilmer* and the other cases cited above, it is true, occurred in the context of an inquiry into whether *Congress* had intended federal statutory claims to be exempt from arbitration. "Just as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by that Act, it is the congressional intention expressed in some other statute on which the courts' must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable." (*Mitsubishi Motors, supra,* 473 U.S. at p. 627 [105 S.Ct. at p. 3354].) But although the court has stated generally that the capacity to withdraw statutory rights from the scope of arbitration agreements is the prerogative solely of Congress, not state courts or legislatures (*Southland, supra,* 465 U.S. at p. 18 [104 S.Ct. at p. 862]), it has never directly decided whether a legislature may restrict a private arbitration agreement when it inherently conflicts with a public statutory purpose that transcends private interests. In the present case, as discussed, we believe there is such an inherent conflict between arbitration and a statutory injunctive relief remedy designed for the protection of the general public. Although both California and federal law recognize the important policy of enforcing arbitration agreements, it would be perverse to extend the policy so far as to preclude states from passing legislation the purposes of which make it incompatible with arbitration, or to compel states to permit the vitiation through arbitration of the substantive rights afforded by such legislation.

In other terms, our holding does not represent a " 'suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants' . . . 'out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes' " (*Gilmer, supra,* 500 U.S. at p. 30 [111 S.Ct. at p. 1654]). Rather, it is a recognition that arbitration cannot necessarily afford all the advantages of adjudication in the area of private attorney general actions, that in a narrow class of such actions arbitration is inappropriate, and that this inappropriateness does not turn on the happenstance of whether the rights and remedies being adjudicated are of state or federal derivation.

Nor does anything in the legislative history of the FAA suggest that Congress contemplated "public injunction" arbitration to be within the universe of arbitration agreements it was attempting to enforce. Indeed, the primary focus of the drafters of the FAA appears to have been on the utility of arbitration in resolving ordinary commercial disputes. (See Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer*

*Rights Claims in an Age of Compelled Arbitration*, (1997) Wis. L.Rev. 33, 75-78; Cohen & Dayton, *The New Federal Arbitration Law* (1926) 12 Va. L.Rev. 265, 285.) Although the court has interpreted the FAA to extend to noncommercial statutory claims, it is doubtful Congress would have envisioned the extension of the FAA to enforce arbitral jurisdiction over a public injunction.[8]

 Our holding that a CLRA injunctive relief action is not subject to arbitration does not necessarily lead to the conclusion that a CLRA action for damages is likewise inarbitrable. On the contrary, as *Mitsubishi Motors, McMahon, Gilmer* and other cases cited above make clear, statutory damages claims are fully arbitrable. Such an action is primarily for the benefit of a party to the arbitration, even if the action incidentally vindicates important public interests. (*Mitsubishi Motors, supra*, 473 U.S. at pp. 635-636 [105 S.Ct. at p. 3358-3359].) In the context of statutory damages claims, the United States Supreme Court has consistently rejected plaintiffs' arguments that abbreviated discovery, arbitration's inability to establish binding precedent, and a plaintiff's right to a jury trial render the arbitral forum inadequate, or that submission of resolution of the claims to arbitration is in any sense a waiver of the substantive rights afforded by statute. (See *Gilmer, supra*, 500 U.S. at pp. 31-32 [111 S.Ct. at p. 1654-1655]; *Mitsubishi Motors, supra*, 473 U.S. at p. 627 [105 S.Ct. at p. 3354].) "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." (*Mitsubishi Motors, supra*, 473 U.S. at p. 628 [105 S.Ct. at p. 3354].)

Thus, although the CLRA might be interpreted to mean that the damages remedy under the Act is to be resolved solely in a judicial forum (see *Keating, supra*, 31 Cal.3d 584), we construe the Act as consistent with the FAA (see *People* v. *Superior Court (Romero)* (1996) 13 Cal.4th 497, 509 [53 Cal.Rptr.2d 789, 917 P.2d 628] [presuming a legislative intent that a statute be constitutional]). We therefore interpret the CLRA as permitting arbitration of damages claims, at least to the extent the FAA governs such claims.

Moreover, although as noted, the CLRA does not address the question of arbitrability directly, the provisions of the statute itself imply that a distinction between an arbitrable request for damages and an inarbitrable request for injunctive relief is warranted. In *Gilmer*, the court suggested that a statute

---

[8]Our holding does not imply that the government itself may not be a *party* to an arbitration agreement. Public sector arbitration is common, for example, in the field of labor relations. (See, e.g., *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608 [116 Cal.Rptr. 507, 526 P.2d 971].) But the Legislature did not intend, nor do we believe the FAA compels, a private attorney general who seeks injunctive relief on behalf of the public to submit the question to a private arbitrator.

such as the ADEA that promotes " 'informal methods of conciliation, conference, and persuasion,' " is consistent with arbitration. (*Gilmer, supra*, 500 U.S. at p. 29 [111 S.Ct. at p. 1654]; 29 U.S.C. § 626(b).) The CLRA promotes such informal methods by requiring a consumer to notify those alleged to have committed deceptive practices at least 30 days prior to commencing an action for damages, and by providing that the consumer may not recover damages if appropriate correction, repair, replacement or other remedy is given. (See §§ 1782, subds. (a)-(c), 1784.) However, section 1782, subdivision (d), provides that an action for injunctive relief may be brought without giving such notice and waiting for such remediation. These differing approaches to actions for damages and for injunctive relief reflect the differing purposes of the two actions. The former is primarily to remedy individual wrongs, and prescribes methods short of litigation to accomplish this. The latter is for the protection of the public, and does not prescribe informal methods of resolution that would compromise that protective purpose. These divergent approaches and purposes are consistent with the conclusion that a CLRA action for damages is amenable to arbitration but an action for injunctive relief is not.

Plaintiffs contend that neither damages nor injunctive relief under the CLRA is subject to arbitration. They argue that insofar as the FAA would prevent states from delegating to state courts exclusively the task of enforcing a particular statute, it is in violation of the Tenth Amendment of the United States Constitution, citing *Printz* v. *United States* (1997) 521 U.S. 898 [117 S.Ct. 2365, 138 L.Ed.2d 914]. In that case, the court reviewed the constitutionality of a provision within the Brady Handgun Violence Prevention Act that required local law enforcement officers to conduct federally mandated background checks on prospective gun owners. The court concluded, under the Tenth Amendment and other provisions of our dual federalist governmental structure, that "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." (521 U.S. at p. 925 [117 S.Ct. at p. 2379].) In the present case, no such implementation "by legislation or executive action," is at issue. Rather, all that is involved is the enforcement of a preemptive federal statute, the FAA, in state court. *Printz* did not alter the general rules of federal supremacy or the enforcement of federal law in state court, nor affect the broad applicability of the FAA to contracts for arbitration, which had been reaffirmed a year before *Printz* in *Doctors Associates, Inc.* v. *Casarotto, supra*, 517 U.S. 681.[9]

Plaintiffs also claim that arbitration of any CLRA claim would waive an important statutory right to judicial review, citing in particular our decision

---

[9]Because we conclude that the FAA does not compel private arbitration of public injunctions, we need not consider plaintiffs' related argument that the Tenth Amendment precludes interpreting the FAA to prohibit legislatures from delegating enforcement of public injunctions exclusively to the courts.

in *Moncharsh, supra,* 3 Cal.4th 1, that an arbitration award cannot be vacated because of evident factual or legal error. In *Moncharsh,* we stated that the risk that an arbitrator's decision will be premised on an error of law or fact is acceptable, in part, because "by voluntarily submitting to arbitration, the parties have agreed to bear that risk in return for a quick, inexpensive, and conclusive resolution to their dispute." (*Id.* at p. 11.) Plaintiffs argue that when the subject of arbitration is an unwaivable statutory right promoting an important public interest, as it is in this case, it is beyond the power of the contracting parties to take that risk of an erroneous legal decision.

Plaintiffs' claim is premature. As the United States Supreme Court has stated: "[A]lthough judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute" at issue. (*McMahon, supra,* 482 U.S. at p. 232 [107 S.Ct. at p. 2340].) The question whether the precise standard of judicial review articulated in *Moncharsh* "is sufficient to ensure that arbitrators comply" with unwaivable statutory requirements does not bear on whether that claim is arbitrable *ab initio.* Rather, that question pertains to the precise standard by which an arbitrator's award of damages under the CLRA will be reviewed by the court petitioned to confirm the arbitration award. It can only be raised, therefore, at the time a party seeks such confirmation. (See Code Civ. Proc., § 1286.2.) We decline to address such an unripe claim here.

■ Plaintiffs also argue that arbitration costs and attorneys fees mandated for a prevailing plaintiff in a CLRA claim (see § 1780, subd. (d)) would not be available under arbitration, and for that reason arbitration of the claim would foreclose important remedies provided under the Act. In support of their contention they cite Code of Civil Procedure section 1284.2, which declares that "each party to the arbitration shall pay his pro rata share of the expenses and fees of the neutral arbitrator" and bear his own attorneys fees unless "the arbitration agreement otherwise provides."

We agree with plaintiffs that the availability of costs and attorneys fees to prevailing plaintiffs is integral to making the CLRA an effective piece of consumer legislation, increasing the financial feasibility of bringing suits under the statute. (See Enrolled Bill Rep. on Assem. Bill No. 3756 (1987-1988 Reg. Sess.) p. 3.) When we construe potentially conflicting statutes, our duty is to harmonize them if reasonably possible. (*County of San Bernardino* v. *City of San Bernardino* (1997) 15 Cal.4th 909, 933 [64 Cal.Rptr.2d 814, 938 P.2d 876].) Here any potential conflict between the California Arbitration Act and the CLRA is easily resolved when we recognize that Code of Civil Procedure section 1284.2 is simply a default

provision. When parties agree to resolve statutory claims through arbitration, it is reasonable to infer that they consent to abide by the substantive and remedial provisions of the statute. (See *Kamakazi Music Corp.* v. *Robbins Music Corp., supra,* 684 F.2d at p. 231.) Otherwise, a party would not be able to fully " 'vindicate [his or her] statutory cause of action in the arbitral forum.' " (*Gilmer, supra,* 500 U.S. at pp. 27-28 [111 S.Ct. at p. 1653].) We therefore interpret Code of Civil Procedure section 1284.2 as giving way to the remedial provisions of the CLRA when parties have agreed to arbitrate claims under that statute. As such, Code of Civil Procedure section 1284.2 presents no barrier to the enforcement of an arbitration agreement containing a CLRA claim.[10]

Finally, plaintiffs claim that the FAA applies only to interstate commerce, and interstate commerce was not at issue here. If the FAA does not apply, then California law might arguably have a less stringent standard for enforcing agreements to arbitrate unwaivable statutory claims. (See *Keating, supra,* 31 Cal.3d 584.) We note that the definition of interstate commerce under the FAA is as broad as under the commerce clause of the United States Constitution. (See *Allied-Bruce Terminix Cos.* v. *Dobson* (1995) 513 U.S. 265 [115 S.Ct. 834, 130 L.Ed.2d 753].) Nonetheless, it is true that the issue of the applicability of the FAA was not raised below, and so the question

---

[10]Plaintiffs cite *Alexander* v. *Gardner-Denver Co.* (1974) 415 U.S. 36 [94 S.Ct. 1011, 39 L.Ed.2d 147], and its progeny—*Barrentine* v. *Arkansas-Best Freight System* (1981) 450 U.S. 728 [101 S.Ct. 1437, 67 L.Ed.2d 641], and *McDonald* v. *West Branch* (1984) 466 U.S. 284 [104 S.Ct. 1799, 80 L.Ed.2d 302]—for the proposition that the United States Supreme Court has not uniformly favored resolution of statutory claims by arbitration. "In *Gardner-Denver,* the issue was whether a discharged employee whose grievance had been arbitrated pursuant to an arbitration clause in a collective-bargaining agreement was precluded from subsequently bringing a Title VII action based upon the conduct that was the subject of the grievance. In holding that the employee was not foreclosed from bringing the Title VII claim, we stressed that an employee's contractual rights under a collective-bargaining agreement are distinct from the employee's statutory Title VII rights[.]" (*Gilmer, supra,* 500 U.S. at pp. 33-34 [111 S.Ct. at p. 1656].) *Barrentine* and *McDonald* involved similar statutory claims submitted to arbitration pursuant to a collective bargaining agreement.

The *Gilmer* court articulated the reasons why these three cases differ from the line of cases quoted above affirming the arbitrability of statutory claims. "First, [these three] cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights . . . . Finally, those cases were not decided under the FAA, which, as discussed above, reflects a 'liberal federal policy favoring arbitration agreements.' " (*Gilmer, supra,* 500 U.S. at p. 35 [111 S.Ct. at p. 1657].) In the present case, none of the above considerations are in play, and these cases are therefore inapposite.

whether the contract between plaintiffs and Cigna was a "contract evidencing a transaction involving commerce" under section 2 of the FAA (9 U.S.C. § 2) has not been litigated. We therefore remand for consideration of this question, and, if it is concluded that section 2 of the FAA does not apply, whether California law warrants a different result on the question of arbitrability of CLRA damages claims.

 United States Supreme Court case law makes clear that when a suit contains both arbitrable and inarbitrable claims, the arbitrable claims should be severed from those that are inarbitrable and sent to arbitration. (*Dean Witter Reynolds Inc.* v. *Byrd, supra,* 470 U.S. at p. 221 [105 S.Ct. at pp. 1242-1243].) This is so even when severance leads to inefficiency. (*Ibid.*) In the present case, we are concerned not with distinct arbitrable and inarbitrable claims, but with arbitrable and inarbitrable remedies derived from the same statutory claim. Yet we believe the logic of *Byrd* still applies. Given the strong policy in both federal and state law for arbitrating private disputes, and given the inherent unsuitability of arbitration as a means of resolving plaintiffs' action for injunctive relief under the CLRA, the injunctive relief action alone should be decided in a judicial forum. Therefore, assuming the damages portion of the CLRA claim is found to be arbitrable under the arbitration agreement and subject to the FAA or otherwise arbitrable under California law, it should be resolved, together with the malpractice claim, in arbitration.

### III. DISPOSITION

For all of the foregoing, we affirm the judgment of the Court of Appeal in part and reverse in part, and remand the cause for proceedings consistent with this opinion.

George, C. J., Baxter, J., and Werdegar, J., concurred.

**CHIN, J.,** Concurring and Dissenting.—I concur in the majority's holding that an agreement to arbitrate a claim under the Consumers Legal Remedies Act (CLRA or Act) (Civ. Code, §§ 1750-1784)[1] is enforceable to the extent a consumer filing a CLRA claim seeks actual damages, restitution, or punitive damages. Like the majority, in reaching this conclusion, I have not considered issues that are beyond the scope of our order granting review, including plaintiffs' contention that defendant failed to establish the existence of an agreement requiring arbitration of the CLRA claim. (Maj. opn., *ante,* at p. 1073, fn. 2.) Those issues may be raised in subsequent proceedings. Thus, for purposes of deciding the question before us—whether an

---

[1]Unless otherwise indicated, all further statutory references are to the Civil Code.

agreement to arbitrate a CLRA claim is valid and enforceable—I assume the parties made such an agreement and the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.) applies.

However, I dissent from the majority's holding that an agreement to arbitrate a CLRA claim is unenforceable to the extent the consumer seeks "[a]n order enjoining the [unlawful] methods, acts, or practices." (§ 1780, subd. (a)(2).) As a matter of federal law, the FAA and the supremacy clause of the federal Constitution prohibit us from enforcing the CLRA as the majority interprets it. As a matter of statutory construction, nothing requires us to adopt the majority's constitutionally suspect interpretation. The public policy of this state, which the Legislature has expressly declared through the arbitration statutes, requires that we enforce arbitration agreements according to their terms. The majority's conclusion frustrates this public policy. Moreover, I find nothing in the CLRA indicating, either explicitly or implicitly, that the Legislature intended to override this statutorily declared public policy and prohibit arbitration of CLRA injunction requests. On the contrary, both the structure and language of the CLRA suggest the Legislature viewed arbitration of injunction requests as consistent with the CLRA's goals.

Of course, at first glance, the majority's interpretation may seem appealing, because the facts alleged in this case are tragic and plaintiffs do not want to arbitrate. However, the majority's holding extends beyond this setting; it prevents full enforcement of an arbitration agreement even between parties who desire and expressly agree to arbitrate all aspects of a CLRA claim in order to avoid costly and often slow court proceedings. As I will explain, I conclude that an agreement to arbitrate a CLRA claim is enforceable in its entirety.

## I. UNDER THE MAJORITY'S CONSTRUCTION, THE CLRA CONFLICTS WITH THE FAA AND IS UNCONSTITUTIONAL IN PART.

In enacting the FAA, Congress "intended to 'revers[e] centuries of judicial hostility to arbitration agreements,' [citation], by 'plac[ing] [them] "upon the same footing as other contracts." ' " (*Shearson/American Express Inc.* v. *McMahon* (1987) 482 U.S. 220, 225-226 [107 S.Ct. 2332, 2337, 96 L.Ed.2d 185] (*Shearson*).) Section 2 of the FAA provides: "A written provision in . . . a contract evidencing a transaction involving [interstate] commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) This provision "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their

terms" (*Volt Info. Sciences* v. *Leland Stanford Jr. U.* (1989) 489 U.S. 468, 478 [109 S.Ct. 1248, 1255, 103 L.Ed.2d 488] (*Volt*)), and "mandates enforcement of agreements to arbitrate," even if they include "statutory claims." (*Shearson, supra*, 482 U.S. at p. 226 [107 S.Ct. at p. 2237].) "The 'liberal federal policy favoring arbitration agreements,' [citation], manifested by this provision and the [FAA] as a whole, is at bottom a policy guaranteeing the enforcement of private contractual arrangements: the [FAA] simply 'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate.' [Citation.]" (*Mitsubishi Motors* v. *Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 625 [105 S.Ct. 3346, 3353, 87 L.Ed.2d 444], fn. omitted (*Mitsubishi*).)

The United States Supreme Court has demonstrated the primacy and scope of this duty by repeatedly invalidating, under the supremacy clause of the federal Constitution, state statutes that attempt to limit the enforceability of arbitration agreements. For example, in *Perry* v. *Thomas* (1987) 482 U.S. 483, 491 [107 S.Ct. 2520, 2526, 96 L.Ed.2d 426] (*Perry*), the court held the FAA preempts a California statute that prohibits enforcement of an agreement to arbitrate an action to collect wages. It reasoned in part that " '[s]ection 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements, *notwithstanding any state substantive or procedural policies to the contrary.*' " (*Perry, supra*, 482 U.S. at p. 489 [107 S.Ct. at p. 2525], italics added.) And, in *Southland Corp.* v. *Keating* (1984) 465 U.S. 1, 16 [104 S.Ct. 852, 861, 79 L.Ed.2d 1] (*Southland*), the high court invalidated a California statute that we had construed to prohibit arbitration of claims under the California Franchise Investment Law. According to the court, in enacting section 2 of the FAA, "Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements" (*Southland, supra*, 465 U.S. at p. 16 [104 S.Ct. at p. 861], fn. omitted) and "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." (*Id.* at p. 10 [104 S.Ct. at p. 858].) The court recently both reaffirmed *Southland* and heightened its impact by holding that the FAA's purpose and Congress's expansive intent require a broad reading of section 2 that extends the FAA's reach to the limits of congressional power under the commerce clause. (*Allied-Bruce Terminix Cos.* v. *Dobson* (1995) 513 U.S. 265, 268-277 [115 S.Ct. 834, 836-841, 130 L.Ed.2d 753] (*Allied-Bruce*).) The court then applied this broad reading of the FAA to nullify an Alabama statute that made predispute arbitration agreements invalid and unenforceable. (*Allied-Bruce, supra*, 513 U.S. at pp. 268-277 [115 S.Ct. at pp. 837-841]; see also *Volt, supra*, 489 U.S. at p. 478 [109 S.Ct. at p. 1255] ["FAA pre-empts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.' "].)

In my view, the majority's conclusion that the CLRA prohibits enforcement of an agreement to arbitrate a CLRA injunction request runs afoul of these high court decisions. Under the majority's interpretation, the Legislature, through the CLRA, has "singl[ed] out arbitration provisions for suspect status," which Congress, through the FAA, has specifically prohibited. (*Doctor's Associates, Inc.* v. *Casarotto* (1996) 517 U.S. 681, 687 [116 S.Ct. 1652, 1656, 134 L.Ed.2d 902].) States may not "decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The [FAA] makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the [FAA's] language and Congress' intent. [Citation.]" (*Allied-Bruce, supra,* 513 U.S. at p. 281 [115 S.Ct. at p. 843].)

Rejecting this conclusion, the majority maintains the FAA permits the Legislature to prohibit enforcement of an agreement to arbitrate a CLRA injunction request. Although acknowledging that the high court "has stated generally" that only *Congress* has this prohibitory power and has recognized an "inherent conflict" exception to the FAA only in determining whether *Congress* intended to preclude arbitration, the majority nevertheless asserts that the court "has never directly decided whether a [state] legislature may restrict a private arbitration agreement when it inherently conflicts with a public statutory purpose that transcends private interests." (Maj. opn., *ante,* at p. 1083.) "[I]t would be perverse," the majority reasons, "to extend the policy [of enforcing arbitration agreements] so far as to preclude states from passing legislation the purposes of which make it incompatible with arbitration, or to compel states to permit the vitiation through arbitration of the substantive rights afforded by such legislation." (*Ibid.*)

I conclude that binding federal authority forecloses the majority's attempt to base an FAA exception for *state* laws limiting enforcement of arbitration agreements on the "inherent conflict" analysis applicable to *congressional* action. As I have shown above, the high court's pronouncements regarding the preemptive effect of the FAA on such state laws have been broad and emphatic. They do not appear to permit any exception. But we need not speculate on that question, because in *Southland* the high court declared: "We discern *only two limitations* on the enforceability of arbitration provisions governed by the [FAA]: they must be part of a written maritime contract or a contract 'evidencing a transaction involving commerce' and such clauses may be revoked upon 'grounds as exist at law or in equity for the revocation of any contract.' *We see nothing in the [FAA] indicating that the broad principle of enforceability is subject to any additional limitations under state law.*" (*Southland, supra,* 465 U.S. at pp. 10-11 [104 S.Ct. at p.

858], italics added, fn. omitted; see also *Perry, supra*, 482 U.S. at pp. 489-490 [107 S.Ct. at pp. 2525-2526] [quoting *Southland*].) Absent one of these two exceptions, we *must* enforce an agreement to arbitrate "unless *Congress* itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." (*Mitsubishi, supra*, 473 U.S. at p. 628 [105 S.Ct. at pp. 3354-3355], italics added.) As the high court recently put it in simple, clear, and unequivocal terms, "state courts cannot apply state statutes that invalidate arbitration agreements." (*Allied-Bruce, supra*, 513 U.S. at p. 272 [115 S.Ct. at p. 838].) The Supreme Court's view could hardly be clearer.

Indeed, *Southland* belies the majority's assertion that the high court "has never directly decided whether a legislature may restrict a private arbitration agreement when it inherently conflicts with a public statutory purpose that transcends private interests." (Maj. opn., *ante*, at p. 1083.) In *Keating* v. *Superior Court* (1982) 31 Cal.3d 584, 598-599 [183 Cal.Rptr. 360, 645 P.2d 1192] (*Keating*), we held that the Legislature, through Corporations Code section 31512, had prohibited enforcement of agreements to arbitrate claims under the California Franchise Investment Law. We also held that this statutory prohibition did not violate the FAA's "general principle of arbitrability," which we construed to include an "exception[]" for state statutes expressing a legislative "determination that the public interest is best served by maintaining access to the [judicial] remedies which the Legislature has provided." (*Keating, supra*, 31 Cal.3d at p. 602.) In words reminiscent of the majority's, we reasoned: "That Congress intended, through the FAA, to override state policies of that nature seems highly improbable." (*Ibid.*) In *Southland*, the high court rejected our reading of the FAA and held that, under our interpretation, the California statute "directly conflicts with § 2 of the [FAA] and violates the Supremacy .Clause." (*Southland, supra*, 465 U.S. at p. 10 [104 S.Ct. at p. 858].)

Justice Stevens dissented from this part of the majority opinion in *Southland*, invoking the FAA exception to arbitrability "based on 'such grounds as exist at law or in equity for the revocation of any contract.' " (*Southland, supra*, 465 U.S. at p. 18 [104 S.Ct. at p. 862] (conc. and dis. opn. of Stevens, J.).) He reasoned that, because a contract void as contrary to public policy is revocable at law or in equity, this exception "leaves room for the implementation of certain substantive state policies that would be undermined by enforcing certain categories of arbitration clauses." (*Ibid.*) More specifically, he argued that, through Corporations Code section 31512, the Legislature had declared an agreement to arbitrate a claim under the Franchise Investment Law to be "void as a matter of public policy" and that "this declaration of state policy [was] entitled to respect." (*Southland, supra*, 465 U.S. at p. 20

[104 S.Ct. at p. 863] (conc. and dis. opn. of Stevens, J.).) He also asserted that the FAA did not override "public policy" limits on enforcing arbitration agreements "simply because the source of" the public policy "is a State rather than the Federal Government," and was not " 'so unyielding as to require enforcement of an agreement to arbitrate a dispute over the application of a regulatory statute which a state legislature . . . has decided should be left to judicial enforcement.' " (*Id.* at p. 21 [104 S.Ct. at p. 864] (conc. and dis. opn. of Stevens, J.).)

The *Southland* majority disagreed with Justice Stevens, explaining: "If we accepted this analysis, states could wholly eviscerate congressional intent to place arbitration agreements 'upon the same footing as other contracts' [citation] simply by passing statutes such as the Franchise Investment Law. We have rejected this analysis because it is in conflict with the [FAA] and would permit states to override the declared policy requiring enforcement of arbitration agreements." (*Southland, supra,* 465 U.S. at p. 17, fn. 11 [104 S.Ct. at p. 861].) *Southland* thus establishes that the FAA invalidates a state statute that limits enforcement of arbitration agreements even where the state legislature *expressly* declares that arbitration "inherently conflicts with a public statutory purpose that transcends private interests." (Maj. opn., *ante*, at p. 1083.) A fortiori, *Southland* also establishes that the FAA prohibits a court from refusing to enforce an agreement to arbitrate a CLRA injunction request by *inferring,* as the majority does, a legislative intent to prohibit arbitration based on a purported inherent conflict with the alleged public purpose of such a request.

*Southland* is significant for another reason; the high court there *refused* to do precisely what the majority now does, i.e., apply legal principles for determining whether *Congress* established an FAA exception to validate *state* laws limiting enforcement of arbitration agreements. In *Wilko* v. *Swan* (1953) 346 U.S. 427, 437 [74 S.Ct. 182, 188, 98 L.Ed. 168] (*Wilko*), overruled in *Rodriguez de Quijas* v. *Shearson/Am. Exp.* (1989) 490 U.S. 477, 484-486 [109 S.Ct. 1917, 1921-1923, 104 L.Ed.2d 526], the Supreme Court concluded that, because "the protective provisions of the [federal] Securities Act require the exercise of judicial discretion to fairly assure their effectiveness, . . . Congress must have intended" to prohibit enforcement of agreements to arbitrate securities claims. In reversing our *Keating* decision, the high court explained in *Southland*: "The California Supreme Court justified its holding by reference to our conclusion in *Wilko* . . . . The analogy is unpersuasive. The question in *Wilko* was not whether a state legislature could create an exception to § 2 of the [FAA], but rather whether Congress, in subsequently enacting the Securities Act, had in fact created such an exception." (*Southland, supra,* 465 U.S. at p. 16, fn. 11 [104 S.Ct. at p.

861].) Thus, contrary to the majority's analysis, the Supreme Court in *Southland* told us that the legal principles governing the scope and exercise of *Congress's* authority to establish exceptions to the FAA may *not* serve as the basis for reading into the FAA an exception for *state* laws that limit enforcement of arbitration agreements.

Finally, I note that federal appellate courts applying the "inherent conflict" analysis even in its proper context—to *congressional* conduct—have rejected the "public injunction" exception the majority now creates. In *Rosenberg* v. *Merrill Lynch, Pierce, Fenner & Smith* (D.Mass. 1998) 995 F.Supp. 190, 212, a federal district court held that Congress intended to preclude enforcement of predispute agreements to arbitrate discrimination claims under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). In reaching this conclusion, the court stressed the "primacy of public rights" under title VII, as evidenced by provisions that allow plaintiffs who "would . . . not be entitled to reinstatement or backpay" nevertheless to "vindicate the rights of others through seeking declaratory and injunctive relief and punitive damages." (995 F.Supp. at p. 205.) On appeal, the First Circuit Court of Appeals rejected the district court's analysis and conclusion, explaining that "the district court [had] overlooked" the high court's view "that public rights may be enforced through arbitration." (*Rosenberg* v. *Merrill Lynch, Pierce, Fenner & Smith* (1st Cir. 1999) 170 F.3d 1, 11, citing *Gilmer* v. *Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20 [111 S.Ct. 1647, 114 L.Ed.2d 26] (*Gilmer*).) In my view, the majority's analysis suffers from the same analytical error; its holding puts the CLRA in conflict with the FAA's commands and renders the CLRA unconstitutional and unenforceable under the federal supremacy clause to the extent it prohibits arbitration of injunction requests.

## II. CLRA INJUNCTION REQUESTS ARE ARBITRABLE UNDER CALIFORNIA LAW.

In adopting a constitutionally suspect construction of the CLRA, the majority violates a cardinal rule of statutory interpretation. "If a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable. [Citations.] The basis of this rule is the presumption that the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers." (*Miller* v. *Municipal Court* (1943) 22

Cal.2d 818, 828 [142 P.2d 297].) Thus, we should not adopt a construction of the CLRA that renders it partially unconstitutional absent statutory language *requiring* that we do so. Because, as I explain below, the CLRA does not contain such language, I reject the majority's conclusion that agreements to arbitrate CLRA injunction requests are unenforceable under California law.

A. *Public Policy Expressly Favors Enforcement of Arbitration Agreements.*

The majority correctly observes that California's public policy strongly favors enforcement of arbitration agreements. (Maj. opn., *ante*, at p. 1074.) Through enactment of "a comprehensive statutory scheme regulating private arbitration . . . , the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' [Citations.]" (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899] (*Moncharsh*).) More than 80 years ago, we explained that "[t]he policy of the law in recognizing arbitration agreements and in providing by statute for their enforcement is to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing." (*Utah Const. Co. v. Western Pac. Ry. Co.* (1916) 174 Cal. 156, 159 [162 P. 631].) Thus, California law, like federal law, establishes "a presumption in favor of arbitrability." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971 [64 Cal.Rptr.2d 843, 938 P.2d 903] (*Engalla*).) The Legislature established this statutory presumption "to overcome earlier judicial hostility to arbitration agreements." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 830 [88 Cal.Rptr.2d 366, 982 P.2d 229] (*Vandenberg*).)

Perhaps the clearest and most unequivocal expression of this public policy favoring arbitration appears in Code of Civil Procedure section 1281. It declares that "[a] written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." This section establishes the "fundamental policy" of California's arbitration scheme: "that arbitration agreements will be enforced *in accordance with their terms*." (*Vandenberg*, *supra*, 21 Cal.4th at p. 836, fn. 10, original italics.) To implement this policy, Code of Civil Procedure section 1281.2 directs that, on petition, a court "shall order" arbitration "if it determines that an agreement to arbitrate the controversy exists, unless it determines that" one of *only three specified exceptions* applies: (1) the petitioner has waived the right to compel arbitration; (2) grounds exist for revoking the agreement; or (3) a party to the agreement is also a party to a

pending legal proceeding with a third party that arises out of the same transaction, and a possibility exists of conflicting rulings on common legal or factual issues.

Of course, the Legislature is free to establish additional exceptions to this statutory command. (Cf. *Shearson, supra,* 482 U.S. at p. 226 [107 S.Ct. at p. 2337] [FAA's statutory mandate "may be overridden by a contrary congressional command"].) The question before us, then, is not whether *we* think arbitration of CLRA claims is a bad idea, but whether *the Legislature* has established an additional exception to Code of Civil Procedure sections 1281 and 1281.2 that precludes arbitration of CLRA claims, either in whole or in part. Moreover, in light of our strong public policy favoring arbitration and the statutes expressly reflecting that public policy, the burden of showing this intent should be on the party opposing arbitration. (*Shearson, supra,* 482 U.S. at p. 227 [107 S.Ct. at pp. 2337-2338].) I conclude that plaintiffs have not met, and cannot meet, this burden.

B. *The CLRA Does Not Establish an Exception to the Statutory Duty to Enforce Arbitration Agreements.*

In concluding that the Legislature has established an exception to the courts' statutory duty to enforce arbitration agreements, the majority does not maintain that the language of the CLRA expressly creates an exception. On the contrary, the majority declares that "the CLRA does not address the question of arbitrability directly . . . ." (Maj. opn., *ante,* at p. 1084.) Nor does the majority assert that the CLRA's legislative history reveals a legislative intent to create an exception. Notably, the majority does not even consider this traditional indicator of legislative intent. Rather, adopting one aspect of the analysis federal courts apply in determining arbitrability under the FAA, the majority begins by asking whether "there [is] an inherent conflict between arbitration and the CLRA." (Maj. opn., *ante,* at p. 1077.) Finding that such a conflict exists, at least as to injunctive relief, the majority then concludes that the Legislature must have intended to prohibit full enforcement of agreements to arbitrate CLRA claims. (*Id.* at pp. 1082-1083.) For several reasons, I disagree.

Initially, the majority does not explain what basis exists in California law for adopting the federal "inherent conflict" analysis, which essentially recognizes *implied* exceptions to the *express* statutory requirement that we enforce arbitration agreements. The majority cites no case where we have

taken a similar approach in applying California's arbitration statutes.[2] Nor do Code of Civil Procedure sections 1281 and 1281.2, which state the *only* grounds for refusing to enforce an arbitration agreement, appear to authorize a judicial search for implied exceptions to their command. Given that the Legislature has expressly established "a [statutory] presumption in favor of arbitrability" (*Engalla, supra,* 15 Cal.4th at p. 971), we have no basis judicially to "presume," as the majority does, that "the Legislature did not intend" to permit arbitration of CLRA injunction requests.[3] (Maj. opn., *ante,* at p. 1082.)

In any event, even applying the "inherent conflict" analysis, because I reject the majority's two underlying premises, I also reject its conclusion that an agreement to arbitrate a CLRA injunction request is unenforceable. The majority's first premise is that a CLRA injunction does "not . . . resolve a private dispute but . . . remed[ies] a public wrong." (Maj. opn., *ante,* at p. 1080.) Thus, in the majority's view, consumers requesting CLRA injunctive relief act merely as "bona fide private attorney[s] general" (*ibid.*)

[2]*Keating, supra,* 31 Cal.3d 584, is not to the contrary. There, in construing the nonwaiver provision of the Franchise Investment Law to prohibit arbitration, we did not cite an inherent conflict between arbitration and that statutory scheme, or even suggest that mode of analysis. Rather, looking to statutory language and legislative history, we concluded the "Legislature intended the nonwaiver provision . . . to be interpreted in accord with *Wilko*[, *supra,* 346 U.S. 427]," which, before passage of the California statute, had interpreted a similar nonwaiver provision to preclude arbitration of certain securities claims. (*Keating, supra,* 31 Cal.3d at p. 599.) We did not, as the majority asserts, "reason[]" that this arbitration prohibition "was warranted . . . because 'the effectiveness of the statute "is lessened in arbitration as compared to judicial proceedings" [citation] in part because of the limited nature of judicial review [citation].' " (Maj. opn., *ante,* at p. 1074.) In the passage the majority quotes from *Keating,* we were simply describing the *Wilko* decision, not independently analyzing the relevant California statute. (See *Keating, supra,* 31 Cal.3d at p. 596.)

The CLRA contains a nonwaiver provision (§ 1751) that is similar to the nonwaiver provision we construed in *Keating, supra,* 31 Cal.3d 584. Presumably because *Southland, supra,* 465 U.S. 1, reversed our *Keating* decision, the majority does not rely on this CLRA provision in refusing to enforce agreements to arbitrate CLRA injunction requests.

[3]To support its assertion that we should "presume" a legislative intent to prohibit arbitration, the majority cites *Gilmer.* (Maj. opn., *ante,* at p. 1082.) However, *Gilmer* says nothing about making such a presumption. It simply states that, in applying federal law, any congressional intent to prohibit arbitration "will be discoverable in the text of the [statute at issue], its legislative history, or an 'inherent conflict' between arbitration and the [statute's] underlying purposes." (*Gilmer, supra,* 500 U.S. at p. 26 [111 S.Ct. at p. 1652].) *Gilmer* also states that courts making this inquiry "should . . . ke[ep] in mind that 'questions of arbitrability must be addressed with a healthy regard for the . . . policy favoring arbitration.' [Citation.]" (*Ibid.*) In my view, the majority fails to heed this admonition in applying the federal "inherent conflict" test to the CLRA. *Gilmer*'s only reference to presumptions is in *refusing* to presume " 'that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators.' [Citation.]" (*Gilmer, supra,* 500 U.S. at p. 30 [111 S.Ct. at p. 1654].) As I later explain, in my view, the majority also fails to follow this aspect of *Gilmer.*

who "by and large" reap no benefit from an injunction against deceptive practices of which they have already been victims. (*Ibid.*)

The provisions of the CLRA indicate the Legislature does not share the majority's view. Under section 1780, *only* a damaged consumer has standing to file a CLRA claim seeking an order enjoining unlawful practices (or any other form of authorized relief). Moreover, the CLRA gives the damaged consumer *complete* control over the litigation. Thus, a CLRA plaintiff may decide not to request an injunction, or may abandon a request at any time, or may settle or dismiss the CLRA claim without obtaining injunctive relief. Of course, these litigation decisions would impact any public benefit of injunctive relief far more than would arbitration. The Legislature would not have given the CLRA plaintiff such unfettered control, and would not have so strictly limited standing to seek injunctive relief, had it viewed a CLRA injunction as only a public remedy that does not resolve a private dispute or benefit the individual CLRA plaintiff. Thus, the provisions of the CLRA belie the majority's conclusion that because CLRA plaintiffs act merely as private attorneys general insofar as they request injunctions, they may not agree to arbitrate that request. If they may decline to make the request or abandon it, then surely they can arbitrate it.

Notably, applying the federal "inherent conflict" analysis the majority now adopts, the United States Supreme Court has twice relied on similar considerations in rejecting claims that the public nature of a particular remedy precluded enforcement of an arbitration agreement. In *Mitsubishi,* the high court considered the argument that antitrust claims under the Sherman Act are not arbitrable because of " 'the pervasive public interest in enforcement of the antitrust laws.' " (*Mitsubishi, supra,* 473 U.S. at p. 629 [105 S.Ct. at p. 3355].) The court recognized that an antitrust claim " ' "is not merely a private matter" ' " and that an antitrust plaintiff " ' "has been likened to a private attorney-general who protects the public's interest." ' " (*Id.* at p. 635 [105 S.Ct. at p. 3358].) It nevertheless concluded that relief under the Sherman Act " 'was conceived of primarily as a remedy for ". . . individuals," ' " explaining: "[T]he antitrust cause of action remains at all times under the control of the individual litigant: no citizen is under an obligation to bring an antitrust suit [citation], and the private antitrust plaintiff needs no executive or judicial approval before settling one." (*Id.* at p. 636 [105 S.Ct. at p. 3359].) Six years later, the court again relied on an individual plaintiff's authority to "settle[] . . . without any [third party] involvement" in rejecting an attack on an arbitration agreement based on an alleged inherent conflict between arbitration and the important public policies furthered by the Age Discrimination in Employment Act of 1967. (*Gilmer, supra,* 500 U.S. at p. 28 [111 S.Ct. at p. 1653].) Thus, that the

Legislature gave the CLRA plaintiff unfettered control over litigation, including an injunction request, strongly suggests it designed the CLRA to resolve private disputes and provide remedies to the individual consumer, not to protect the public.

Another CLRA provision reinforces this conclusion. Section 1752 declares that the CLRA's provisions and remedies "are not exclusive," are "in addition to any other procedures or remedies for any violation or conduct provided for in any other law," and do not "limit any other statutory or any common law rights of the Attorney General or any other person to bring class actions." This section further suggests that the legislative focus of the CLRA was to provide remedies to the individual consumer; the Legislature envisioned that *public* protection would be achieved outside of the CLRA.

The CLRA's legislative history supports this conclusion. Summaries and analyses of the CLRA emphasized its remedial purpose *for the victimized consumer* and said little about public protection. For example, the Legislative Counsel's Digest for the bill enacting the CLRA stated that the Act "provides specific legal remedies for consumers who suffer damage as a result of" an unlawful method, act, or practice. (Legis. Counsel's Dig., Assem. Bill No. 292, 2 Stats. 1970 (Reg. Sess.) Summary Dig., p. 223; see also *Quelimane Co.* v. *Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 46, fn. 9 [77 Cal.Rptr.2d 709, 960 P.2d 513] [digests of Legislative Counsel are relevant to statutory interpretation].) Similarly, an analysis by the Assembly Committee on the Judiciary stressed that the CLRA's purpose was "to provide consumers with remedies as against merchants" because "[n]o such remedies are presently available *to the individual consumer* in California law." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 292 (1970 Reg. Sess.) Apr. 20, 1970, p. 1, italics added; see also *id.* at p. 2 ["The remedies available to the deceived consumer . . . include damages, injunctive relief . . . ."].) Thus, the CLRA's provisions and legislative history indicate that the Legislature designed CLRA injunctive relief to resolve private disputes by providing a complete remedy *to the individual consumer.* The majority does not, and cannot, cite anything to support its contrary assertion that CLRA injunctions were "explicitly designed for public protection." (Maj. opn., *ante*, at p. 1082.)

Finally, besides the Legislature's evident intent, for two additional reasons I disagree with the majority that a CLRA injunction is only a public remedy that does not resolve private disputes or benefit the CLRA plaintiff. First, nothing prevents a CLRA plaintiff from requesting an injunction that merely prohibits a defendant from committing additional unlawful acts against that plaintiff, and only against that plaintiff. This type of limited order would not

appear to be a public remedy at all. Second, given the list of practices the CLRA prohibits (see § 1770), a victimized consumer who continues to transact business with a CLRA defendant, either by choice or necessity, will often benefit from an order enjoining the defendant from committing the unlawful practice again. Under these circumstances, the public benefit of a CLRA injunction is only incidental (or, at best, complementary) to providing the CLRA plaintiff with a complete remedy. The first premise underlying the majority's conclusion is, therefore, unsound.

The majority's second premise fares no better. The majority asserts that private arbitration is inferior to the judicial forum "in administering a public injunctive remedy" and will diminish or frustrate the public benefit of a CLRA injunction. (Maj. opn., *ante*, at p. 1082.) Specifically, the majority asserts that private arbitration has certain "institutional shortcomings" that are especially problematic when dealing with "public injunctions." (*Id.* at p. 1081.)

I need not question the majority's list of purported institutional shortcomings to reject its conclusion. Initially, as I have already explained, the Legislature designed the CLRA, including its injunctive remedy, primarily to benefit the individual consumer, not to protect the public. Thus, the purported institutional shortcomings of arbitration are no more relevant here than in any other context.

In addition, despite its protestations to the contrary (maj. opn., *ante*, at pp. 1083-1084), the majority's reliance on the purported institutional shortcomings of arbitration merely resurrects the judicial hostility toward arbitration that we long ago abandoned and that our arbitration statutes were designed to overcome. As the United States Supreme Court stated in rejecting similar arguments, the majority's qualms about arbitration do "not rest on any evidence, either 'in the record . . . [or] in the facts of which [we may] take judicial notice,'" but instead simply "reflect a general suspicion of the desirability of arbitration and the competence of arbitration tribunals." (*Shearson, supra*, 482 U.S. at p. 231 [107 S.Ct. at p. 2340].) The majority's mistrust of arbitration is "'far out of step with our current strong endorsement of . . . statutes favoring this method of resolving disputes.' [Citation.]" (*Gilmer, supra*, 500 U.S. at p. 30 [111 S.Ct. at p. 1654]; see also *Shearson, supra*, 482 U.S. at p. 233 [107 S.Ct. at p. 2341] [mistrust of arbitration "is difficult to square with [the prevailing] assessment of arbitration"].) I thought "we [were] well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." (*Mitsubishi, supra*, 473 U.S. at pp. 626-627 [105 S.Ct. at p. 3354].) "We should not now turn the judicial clock backwards to an era of

hostility toward arbitration." (*Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 714 [131 Cal.Rptr. 882, 552 P.2d 1178].)

More importantly, given the statutory duty the Legislature imposed on us to enforce arbitration agreements according to their terms (Code Civ. Proc., §§ 1281, 1281.2), it is not our judicial prerogative to decide that "arbitration is not a suitable forum" (maj. opn., *ante*, at p. 1080) or that "judges, rather than arbitrators, are the most appropriate overseers of injunctive remedies explicitly designed for public protection." (*Id.* at p. 1082.) As Justice Mosk recently wrote for a unanimous court, the desirability of arbitration "implicates an issue of public policy—an issue that the Legislature has already resolved" through Code of Civil Procedure section 1281.2. (*Mercury Ins. Group* v. *Superior Court* (1998) 19 Cal.4th 332, 351 [79 Cal.Rptr.2d 308, 965 P.2d 1178].) "If [the majority] believes that the law should allow an additional [exception] for [public injunctions]," it should relay its concerns "to the body that can [properly provide] satisfaction—which is the Legislature . . . ." (*Ibid.*)[4]

In short, neither of the premises central to the majority's analysis is valid. Thus, they are insufficient to support the majority's inference that because an inherent conflict exists between arbitration and the purpose of a CLRA injunction, the Legislature must have intended to exclude CLRA claims from the express statutory rule requiring full enforcement of arbitration agreements.

Moreover, other CLRA provisions suggest that arbitration of CLRA injunction requests does not conflict with, and indeed advances, the CLRA's goals. I have already discussed section 1752, which declares that the CLRA's provisions and remedies "are not exclusive," are "in addition to any other procedures or remedies for any violation or conduct provided for in any other law," and do not "limit any other statutory or any common law

---

[4]Similarly, in the CLRA, the Legislature has already expressed its view regarding the majority's concern that "only the parties to [a CLRA] injunction" initially issued in arbitration "would be able to enforce it . . . ." (Maj. opn., *ante*, at p. 1081.) As I have already explained, the Legislature gave the CLRA plaintiff sole control over the claim, including the decision to make and pursue an injunction request. Thus, even if the majority is correct that only parties would be able to enforce an arbitral CLRA injunction—an issue that has not been decided and is not before us—this result would be completely consistent with the Legislature's intent. Moreover, where a CLRA claim proceeds as a class action under section 1781, all class members would be able to enforce the injunction. Thus, the population of damaged consumers with enforcement power is not necessarily as small as the majority suggests. In any event, the scenario the majority imagines would probably arise rarely, if ever; the CLRA defendant would have to continue to commit the identical practice, *despite* losing a lawsuit, perhaps paying both damages and punitive damages, and being ordered to stop, and all of the CLRA plaintiffs would have to decline to enforce the injunction they went to substantial effort to obtain. We should not base a general rule prohibiting arbitration of CLRA injunction requests on this seemingly remote possibility.

rights of the Attorney General or any other person to bring class actions." Thus, enforcement of a damaged consumer's agreement to arbitrate a CLRA injunction request "will not preclude" others, including the Attorney General, "from bringing actions seeking class-wide and equitable relief." (*Gilmer, supra,* 500 U.S. at p. 32 [111 S.Ct. at p. 1655].) In *Gilmer,* the United States Supreme Court cited similar considerations in rejecting the claim that an inherent conflict exists between arbitration and enforcement of the important public policies furthered by the Age Discrimination in Employment Act of 1967. (*Gilmer, supra,* 500 U.S. at p. 32 [111 S.Ct. at p. 1655].)

In addition, as the majority correctly explains, sections 1782 and 1784 of the CLRA *promote* informal methods of dispute resolution by establishing a notice and opportunity to cure mechanism that conditions a damaged consumer's ability to file an action for and recover damages. (Maj. opn., *ante,* at pp. 1084-1085.) To quote the high court, that a statute directs resort to " 'informal methods of conciliation, conference, and persuasion' [citation] . . . suggests that out-of-court dispute resolution, such as arbitration, is consistent with the statutory scheme" at issue. (*Gilmer, supra,* 500 U.S. at p. 29 [111 S.Ct. at p. 1654].) Thus, the CLRA's informal "cure" mechanism suggests that arbitration is consistent with the CLRA's statutory scheme.

The majority draws this same inference from sections 1782 and 1784, but, citing section 1782, subdivision (d), refuses to apply it to an injunction request. (Maj. opn., *ante,* at pp. 1084-1085.) Section 1782, subdivision (d), *permits a damaged consumer to file an action for injunctive relief without first invoking the CLRA's informal "cure" mechanism.* According to the majority, the separate treatment this section affords an injunction request is consistent with the conclusion that such a request is not arbitrable. (Maj. opn., *ante,* at pp. 1084-1085.)

I find that section 1782, subdivision (d), is more consistent with the opposite conclusion. Its exclusion of injunction requests from the CLRA's "cure" mechanism suggests, in my view, a legislative desire for speedy determination of such requests and a speedy end to the unlawful practices being committed. Supporting this inference is section 1760, which declares that one of the CLRA's purposes is "to provide efficient and economical procedures to secure [consumer] protection." As I have already explained, our public policy encourages arbitration precisely *because* it avoids the delays of the judicial forum and offers a relatively speedy and economical method for resolving disputes. (*Moncharsh, supra,* 3 Cal.4th at p. 9.) Arbitration of a CLRA injunction request would therefore *serve* a legislative desire for speed and efficiency. By contrast, the majority's insistence on judicial determination of CLRA injunction requests despite the parties'

agreement to arbitrate *hinders* those goals, potentially *perpetuates* unlawful practices, and therefore *disserves* the very public interest the majority seeks to further. Thus, I find section 1782, subdivision (d), to be more supportive of the conclusion that arbitration of a CLRA injunction request is consistent with the statutory scheme, than of the majority's contrary conclusion.

Finally, I also disagree with the majority's assertion that section 1780, subdivision (c), suggests the Legislature intended to prohibit arbitration of CLRA injunction requests. (Maj. opn., *ante*, at p. 1082.) Section 1780, subdivision (c), provides in relevant part: "If within the [specified] county there is a municipal court, having jurisdiction of the subject matter, . . . then that court is the proper court for the trial of the action. Otherwise, any court in the county having jurisdiction of the subject matter is the proper court for the trial thereof." This section is simply a standard venue provision; it specifies which court among those having subject matter jurisdiction is the proper one for trial. In my view, this venue provision, which is similar to the venue provisions of many other statutory schemes, does not indicate a legislative intent to preclude arbitration.

In summary, nothing in the language, structure, or legislative history of the CLRA establishes, or even suggests, that an inherent conflict exists between the Act's goals and arbitration of a CLRA injunction request. On the contrary, those sources all suggest that arbitration of a CLRA injunction request is consistent with the Act's goals. Thus, the statutory command to enforce arbitration agreements according to their terms fully applies to an agreement to arbitrate a CLRA claim, including a request for an injunction. I therefore cannot join the majority's holding that an agreement to arbitrate a CLRA injunction request is unenforceable. I would hold that an agreement to arbitrate a CLRA claim is enforceable in its entirety.

Brown, J., concurred.

**KENNARD, J.,** Dissenting.—In this case, defendant Cigna Healthplans of California sought arbitration of plaintiffs' claims against it, including a statutory claim under the Consumers Legal Remedies Act (CLRA; Civ. Code, § 1750 et seq.). Defendant, however, failed to produce any competent evidence to meet its burden of establishing the existence of an agreement to arbitrate plaintiffs' claims. Accordingly, the trial court should have denied defendant's petition for arbitration.

Because defendant failed to prove the existence of an arbitration agreement, it is impossible to know the scope of the alleged arbitration agreement and whether it was intended to include plaintiffs' CLRA claim. The majority nonetheless decides the arbitrability of CLRA claims, concluding that such claims are arbitrable to the extent they seek damages but not to the extent

they seek injunctive relief. I do not join the majority's advisory opinion on the question. Instead, I would await a case in which the question is clearly presented on the record.

The majority also appears to suggest that parties to an arbitration agreement may not use a choice of law provision to restrict the scope of arbitrable claims. I disagree. Rather than let the majority's suggestion go unquestioned and potentially mislead courts in the future, I explain the basis of my disagreement below.

## I

Plaintiffs are a mother and son who are Medi-Cal members. Defendant Cigna Healthplans of California (Cigna) offers HMO-type medical insurance plans to Medi-Cal members, for which Medi-Cal pays the cost. It appears that plaintiff mother joined Cigna's plan in 1991. Her son was injured during birth in December 1993. Plaintiffs brought this action against Cigna, the hospital, and the son's doctors, alleging medical malpractice and seeking damages. Plaintiffs also allege that Cigna violated the CLRA by making false and misleading statements concerning the quality of medical care Cigna provides to Medi-Cal members; they seek damages and injunctive relief for this alleged CLRA violation. Cigna petitioned for arbitration, claiming there was an arbitration provision in the contract between it and the State of California governing the Medi-Cal health plan to which plaintiffs belonged.

Cigna never produced a copy of the alleged arbitration agreement, however. Instead, it initially submitted with its arbitration petition, without any foundational or authenticating testimony, a copy of an "Evidence of Coverage and Disclosure Form" for employees (*not* Medi-Cal recipients) covered by employee group health insurance plans it offers. That document describes a procedure for arbitrating disputes relating to employee health benefits, but it also notes in bold face: "This Combined Evidence of Coverage and Disclosure Form constitutes only a summary of the Agreement. The Group Services Agreement must be consulted to determine the exact terms and conditions of coverage." Cigna also submitted both a 1985 Medicare (*not* Medi-Cal) Supplement plan brochure with a similar arbitration description and an undated "Cigna Healthplan Disclosure Form" for *employee* group health plans describing a provision for arbitration.

In the trial court, Cigna later submitted with its reply in support of arbitration, but again without any foundational or authenticating testimony, two versions of a summary of benefits for Medi-Cal patients that were included in documents produced by plaintiffs. The summaries themselves are undated, but other documents and certain notations suggest that one was

given to plaintiff mother in January 1994 and the other in December 1994. The January 1994 summary makes no mention of arbitration. The December 1994 summary states that arbitration applies only to "any controversy . . . arising from a medical practice claim," apparently thereby excluding from arbitration CLRA claims that, like plaintiffs', are based on false advertising. It also states that the arbitration shall be "governed by the provisions of the California Code of Civil procedure [*sic*]." Cigna never produced the underlying agreements between it and the State of California that these documents purported to summarize.

The trial court ordered arbitration of plaintiffs' malpractice claim but not their CLRA claim. The Court of Appeal affirmed, holding that the CLRA claim was not arbitrable because an arbitrator lacks authority to grant and enforce injunctive relief intended to benefit the general public. The majority agrees that plaintiffs' CLRA claim is not arbitrable to the extent it seeks injunctive relief but concludes that it is arbitrable to the extent it seeks damages.

## II

Arbitration is a creature of contract. "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." (*First Options of Chicago, Inc.* v. *Kaplan* (1995) 514 U.S. 938, 943 [115 S.Ct. 1920, 1924, 131 L.Ed.2d 985].) " 'In cases involving private arbitration, "[t]he scope of arbitration is . . . a matter of agreement between the parties" [citation], and " '[t]he powers of an arbitrator are limited and circumscribed by the agreement or stipulation of submission.' " [Citations.]' " (*Vandenberg* v. *Superior Court* (1999) 21 Cal.4th 815, 830 [88 Cal.Rptr.2d 366, 982 P.2d 229].)

Accordingly, the question of whether the parties have agreed to arbitrate, the scope of the claims they have agreed to arbitrate, the methods by which the arbitration is to be conducted, and the remedies available to the arbitrator all depend upon the terms of the agreement between the parties. Without knowing the content of the agreement between the parties, it is impossible to answer the question of whether the parties have agreed to arbitrate a particular claim.

Here, the record before us contains no substantial evidence of any arbitration agreement between the parties. Cigna, while insisting on its alleged right to arbitrate plaintiffs' claims, never produced any competent evidence of the alleged arbitration agreement. It failed to produce its alleged agreement with the State of California establishing its medical plan for Medi-Cal members. Some of the various benefits summaries it produced do not

describe Medi-Cal plans; of the two that do, one makes no mention of any arbitration agreement and the other describes an arbitration agreement excluding entirely CLRA claims like those of plaintiffs. All of the summaries were produced without any foundational or authenticating testimony stating that the summaries accurately described the terms of an arbitration agreement to which plaintiffs are subject or stating the effective date of any such arbitration agreement.

Cigna's evidentiary failure alone should have doomed its petition for arbitration. A court may not order arbitration where, as here, there is no substantial evidence of the existence of a valid written agreement to arbitrate. (Code Civ. Proc., § 1281.2; *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 406, 409 [58 Cal.Rptr.2d 875, 926 P.2d 1061].)

The majority does not dispute the absence of any arbitration agreement between the parties. It nonetheless decides the abstract and hypothetical question of whether, if two parties agree to arbitrate CLRA claims and the agreement is subject to the United States Arbitration Act (USAA; 9 U.S.C. § 1 et seq.), the USAA allows California to forbid arbitration of CLRA claims. In doing so, the majority renders an advisory opinion. Although its decision that claims for injunctive relief under the CLRA are nonarbitrable may be correct, I would decide the question only in a case where it is present on the record before us.

### III

In the course of its decision, the majority appears to suggest that parties to an arbitration agreement may not use a choice of law provision to restrict the scope of arbitrable claims. I disagree.

Arbitration is a matter of contract. Accordingly, the only claims that may be arbitrated are those the parties have identified in their arbitration agreement. In turn, there are many methods by which the parties can identify the claims they have agreed to arbitrate. For example, they may specify the arbitrable claims directly as those arising out of a particular transaction or event, those arising within a particular time period, or those based on a particular legal theory. Or the parties may identify the arbitrable claims indirectly by choosing a body of private arbitration rules that specifies the scope of arbitrable claims. In doing so, they incorporate by reference the claims limitations determined by those rules. The parties may also indirectly specify the scope of arbitrable claims by including a choice of law provision that selects a body of law limiting the arbitrability of certain claims. Such a choice of law provision, if the parties so intend, incorporates by reference whatever limits on the scope of arbitrability are established by the chosen body of law. (See generally, *Mastrobuono v. Shearson Lehman Hutton, Inc.*

(1995) 514 U.S. 52 [115 S.Ct. 1212, 131 L.Ed.2d 76] [examining an arbitration agreement's choice of law provision and its provision adopting a body of private arbitration rules to determine whether parties intended to exclude a particular form of remedy from the arbitration].)

Thus, in this case, if an arbitration agreement does exist between the parties, determining whether plaintiffs' CLRA claims are arbitrable would involve the following inquiry: Does the parties' arbitration agreement include CLRA claims within the scope of an express specification of the claims subject to arbitration? Have the parties incorporated by reference in their agreement an arbitration rule authorizing or limiting arbitration of CLRA claims? Have the parties incorporated by reference a body of law restricting arbitration of CLRA claims and, if so, did the parties thereby intend to exclude CLRA claims from arbitration?

Only after it is determined that the parties have in some manner authorized arbitration of CLRA claims and have not chosen a body of law restricting arbitration of those claims would it be necessary to reach the further questions addressed by the majority: Whether California law restricts or prohibits arbitration of CLRA claims notwithstanding the intent of the parties to arbitrate those claims and, if so, whether the USAA permits California to do so.

The majority appears to take a somewhat different view of the use of a choice of law provision to shape the contours of an arbitration agreement. The majority opinion may be read to suggest that section 2 of the USAA, which provides as a matter of federal law that arbitration agreements are generally enforceable according to their terms notwithstanding any contrary provision of state law, forbids the parties from using a choice of law provision to limit the scope of an arbitration agreement. (Maj. opn., *ante*, at pp. 1077-1078.) The two United States Supreme Court decisions the majority cites, *Doctor's Associates, Inc.* v. *Casarotto* (1996) 517 U.S. 681 [116 S.Ct. 1652, 134 L.Ed.2d 902] and *Volt Info. Sciences* v. *Leland Stanford Jr. U.* (1989) 489 U.S. 468 [109 S.Ct. 1248, 103 L.Ed.2d 488], do not support this proposition. At issue in *Doctor's Associates* was a state law applying only to arbitration agreements that would have precluded enforcement of the parties' arbitration clause, contrary to the intent of the parties to arbitrate their disputes. The high court held that section 2 of the USAA preempted that state law. No choice of law provision was at issue. (*Doctor's Associates, Inc.* v. *Casarotto, supra*, 517 U.S. at pp. 687-688 [116 S.Ct. 1652, 1656-1657].) In *Volt*, the parties to an arbitration agreement had agreed that California law, rather than the federal law of the USAA, should govern their arbitration procedure. The high court held that the USAA did not preclude the parties from choosing to have their arbitration governed by California's

arbitration law rather than by the procedures of the USAA. (*Volt Info. Sciences* v. *Leland Stanford Jr. U., supra,* 489 U.S. at pp. 476-479 [109 S.Ct. at pp. 1254-1256].)

These two cases stand only for the proposition that the USAA preempts state law from restricting the scope of arbitrable claims contrary to the intent of the parties as manifested in the arbitration agreement. Both those cases acknowledge that the purpose of the USAA is only to " 'ensur[e] that private agreements to arbitrate are enforced according to their terms.' " (*Doctor's Associates, Inc.* v. *Casarotto, supra,* 517 U.S. 681, 688 [116 S.Ct. 1652, 1657], quoting *Volt Info. Sciences* v. *Leland Stanford Jr. U., supra,* 489 U.S. 468, 479 [109 S.Ct. 1248, 1256].) "[P]arties are generally free to structure their arbitration agreements as they see fit." (*Volt Info. Sciences* v. *Leland Stanford Jr. U., supra,* 489 U.S. at p. 479 [109 S.Ct. at p. 1256].) "[T]he [USAA] does not . . . prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement [citations]. It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." (*Id.* at p. 478 [109 S.Ct. at p. 1255].)

Accordingly, when a procedural or substantive limitation on arbitration is voluntarily adopted by the parties through a choice of law provision, and is not imposed unwillingly on them by a state, judicial enforcement of the parties' freely chosen limitation is fully consistent with the USAA. In that situation, a court is merely enforcing the arbitration agreement "according to [its] terms." (*Volt Info. Sciences* v. *Leland Stanford Jr. U., supra,* 489 U.S. 468, 479 [109 S.Ct. 1248, 1256].) Otherwise stated, under the USAA parties seeking to exclude a particular class of claims from arbitration under their arbitration agreement are free to do so either by expressly describing those claims in the arbitration agreement or by using a choice of law clause to incorporate by reference a law prohibiting arbitration of those claims.

CONCLUSION

Because the record contains no arbitration agreement between the parties, I would reverse the judgment of the Court of Appeal and instruct it to vacate the trial court's partial order of arbitration and to remand for further proceedings.