LIU, J.,
Dissenting.—Whether Target may charge sales tax on a cup of coffee is probably not the most gripping issue before the California Supreme Court this term. But this is not really a tax case. This is a case about the reach of consumer protection statutes that prohibit unfair business practices, including misrepresentations by a retailer as to what its customers are actually paying for. Today’s decision weakens those statutes by blessing an arrangement that mutually benefits retailers and the state treasury at the expense of everyday consumers. Because our tax laws do not foreclose private enforcement of consumer rights in the manner the court suggests (if they do at all), I respectfully dissent.
I.
When we go to a store like Target, we pay sales tax on many of the things we buy. Legally speaking, though, what we commonly call sales tax is actually sales tax reimbursement because the tax applies to the retailer, not the customer. (Rev. & Tax. Code, § 6051; all undesignated statutory references are to this code.) In other words, the retailer is the taxpayer responsible for paying sales tax; when a customer pays sales tax on a transaction, the customer is actually reimbursing the retailer for its sales tax liability arising from the transaction. Importantly, no law requires a retailer to recoup sales taxes from its customers, and no law requires customers to reimburse a retailer for sales taxes. “Whether a retailer may add sales tax reimbursement to the sales price of the tangible personal property sold at retail to a purchaser depends solely upon the terms of the agreement of sale.” (Civ. Code, § 1656.1, subd. (a).) As with any sales agreement, the terms must not misrepresent what the purchaser is paying for.
According to plaintiffs’ allegations, which we accept as true on demurrer, Target charges its customers sales tax reimbursement on all sales of hot coffee to go even though not all such sales are subject to sales tax. As the complaint says, Target “falsely and illegally represented to members of the general public that it had the legal right to charge the sales taxes,” thereby causing customers to pay an additional charge on hot coffee to go based on a misrepresentation. This misrepresentation, plaintiffs contend, violates the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.).
*1136 Target has not sought a determination by the Board of Equalization (the Board) as to whether hot coffee to go is subject to sales tax. Instead, Target says it has paid to the Board all sales tax reimbursement collected on sales of hot coffee to go and that plaintiffs are statutorily and constitutionally barred from bringing this suit. In response, plaintiffs argue that there is no record of whether Target has paid to the Board the sales tax reimbursement it collected on hot coffee to go and that even if Target has done so, the suit may still go forward.
One might wonder why Target would adopt such an arrangement—that is, charging its customers sales tax reimbursement on hot coffee to go and then remitting all the proceeds to the Board. At first glance, it does not appear that Target has unjustly enriched itself, as plaintiffs contend.
But here it is important to note that the law governing whether a sale of hot coffee is subject to sales tax is remarkably complex. Section 6359 generally exempts from sales taxes “the sale of . . . food products for human consumption.” (§ 6359, subd. (a).) The term “food products” is defined to include “coffee.” (§ 6359, subd. (b)(1).) But the statute provides that this exemption does not apply “[wjhen the food products are served as meals on or off the premises of the retailer” (§ 6359, subd. (d)(1)) or “are furnished, prepared, or served for consumption at tables, chairs, or counters” (§ 6359, subd. (d)(2)). Further, the sales tax exemption does not apply “[wjhen the food products are ordinarily sold for immediate consumption on or near a location at which parking facilities are provided primarily for the use of patrons in consuming the products purchased at the location, even though those products are sold on a ‘take out’ or ‘to go’ order and are actually packaged or wrapped and taken from the premises of the retailer.” (§ 6359, subd. (d)(3).) The exemption also does not apply “[wjhen the food products sold are furnished in a form suitable for consumption on the seller’s premises, and both of the following apply: [][] (A) Over 80 percent of the seller’s gross receipts are from the sale of food products. [j[] (B) Over 80 percent of the seller’s retail sales of food products are sales subject to tax . . . .” (§ 6359, subd. (d)(6).) And the exemption does not apply “[wjhen the food products are sold as hot prepared food products,” although sales of “beverages (other than bouillon, consommé, or soup)” are exempt. (§ 6359, subds. (d)(7), (e).) Finally, California Code of Regulations, title 18, section 1603, subdivision (c) (1)(B) provides that the sale of hot coffee “on a ‘take-out’ or ‘to go’ order” by a seller that does not satisfy the “80-80” criteria described in subdivision (d) (6) of section 6359 is not subject to sales tax.
Thus, some sales of hot coffee are likely subject to sales tax while other sales are not. The key point is that sorting all this out would be quite onerous for Target. As the Board explains in its amicus curiae brief, “the overhead *1137 expenses Target would incur in order to differentiate ‘to go’ sales from in-store sales could be quite large. . . . Target would have to distinguish sales of coffee where the customer bought the coffee and immediately left the store from those where the customer bought the coffee but continued to shop in the same store or drank the coffee at tables and chairs in the coffee sales area. In addition, since the analysis must be made on a location-by-location basis, Target would need to conduct investigations in each of its California locations. [Citation.] The amount of administrative expense incurred to obtain such figures and maintain proper records would likely be passed on to Target’s customers in the form of higher prices.”
Rather than keep track of what its customers do with each cup of hot coffee to go, it is far simpler and less costly for Target to collect sales tax reimbursement on every sale and remit those amounts to the Board. In so doing, Target gains the advantage of advertising its coffee at a lower price before adding to each sale a charge for what it represents as sales tax.
Of course, Target is not required to take advantage of any sales tax exemption (see §§ 6905, 6933 [taxpayer’s failure to bring timely claim to recover overpayment “constitutes a waiver”]), and Target may understandably believe that the burden of maintaining relevant records and proving the exemption’s applicability to particular transactions is not worth the benefit (see maj. opn., ante, at pp. 1107, 1129). Moreover, it is possible that consumers end up paying less for hot coffee to go than if Target were to track each cup of coffee and pass the administrative costs on to its customers.
But none of this speaks to whether a retailer may represent to its customers that it is collecting sales tax on a transaction when the transaction is not actually subject to sales tax. That is the unlawful business practice alleged here. For both Target and its customers, it may be more efficient for Target not to incur the cost of tracking each cup of coffee. But as the court acknowledges (maj. opn., ante, at p. 1120, fn. 11), this efficiency need not come at expense of misleading consumers as to what they are paying for. Target could have avoided this lawsuit simply by advertising hot coffee to go at a higher (post-tax) price with a sign that says “all prices include applicable sales tax.” Such an approach would not misinform customers; it would tell them that the price they are paying includes any applicable sales tax, with no representation as to whether sales tax was applicable to a particular transaction. Indeed, the Board has informally advised Target to use this approach to avoid future problems. But it is evident that this approach would eliminate the competitive advantage that Target enjoys from its current practice of advertising its coffee at a lower (pre-tax) price and then adding sales tax to each sale, whether or not each sale is actually subject to sales tax.
*1138 II.
The court today holds that a customer has no judicial recourse to challenge this arrangement because only the retailer, who is the taxpayer, can seek an official determination of whether sales tax is actually owed. According to the court, the customer’s only recourse is to politely ask the Board to consider the issue, even though no law requires the Board to resolve the issue upon a consumer’s request. The upshot is that Target, which has every reason to avoid administrative costs and keep its advertised prices low, will have no incentive to seek an official determination so long as it remits all of the sales tax reimbursement it collects to the Board. And the Board has little incentive to question whether the amount of tax revenue it receives from Target is too much. The customer is the only one harmed. The customer is the only one with a reason to compel an official determination of whether Target has misled the public by purporting to collect reimbursement for sales taxes that it does not actually owe.
Today’s opinion does not really dispute that telling customers they are being charged for sales tax when no sales tax applies is an unlawful business practice within the meaning of the UCL and CLRA. Instead, the court holds that no consumer may invoke the UCL or CLRA to seek an adjudication of the issue because the tax laws do not allow it. The court’s expansive discussion of the tax laws boils down to two claims, one specific and one general: First, section 6901.5 provides a safe harbor for retailers who collect excess sales tax reimbursement and remit the excess amount to the Board. Upon reaching this safe harbor, “the retailer’s obligations are at an end.” (Maj. opn., ante, at p. 1120.) Second, “the tax code contemplates that the method by which the taxability of a sale may be challenged and determined is through an audit or deficiency determination made by the Board, or through a taxpayer’s refund claim before the Board, followed by judicial review of the Board’s decision.” (Id. at p. 1127.) Any other process, the court says, would undermine the orderly administration of the tax laws. (Id. at p. 1130.) Neither claim is persuasive.
A.
The court acknowledges, as it must, that the UCL and CLRA provide “broad” protection for consumers against unfair business practices. (Maj. opn., ante, at p. 1125; see Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 181 [83 Cal.Rptr.2d 548, 973 P.2d 527] (Cel-Tech) [UCL’s “ ‘broad, sweeping language’ ” was intended “ ‘to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur’ ” and “ ‘precisely to enable judicial tribunals to deal with the innumerable “ ‘new schemes which the *1139 fertility of man’s invention would contrive’ ” ’ ”]; Broughton v. Cigna Healthplans (1999) 21 Cal.4th 1066, 1077 [90 Cal.Rptr.2d 334, 988 P.2d 67] [“The CLRA was enacted in an attempt to alleviate social and economic problems stemming from deceptive business practices . . . .”]; Civ. Code, § 1760 [CLRA “shall be liberally construed and applied to promote its underlying purposes”].) In her amicus curiae brief, the Attorney General notes that she “receives thousands of complaints each year and is not in a position to investigate and prosecute all of them. Legitimate actions by private litigants are necessary to supplement law enforcement efforts and to vindicate consumers’ rights.”
Our case law holds that “[w]hen specific legislation provides a ‘safe harbor,’ plaintiffs may not use the general unfair competition law to assault that harbor.” (Cel-Tech, supra, 20 Cal.4th at p. 182.) But we have made clear that “[t]o forestall an action under the unfair competition law, another provision must actually ‘bar’ the action or clearly permit the conduct.” (Id. at p. 183.) The court does not contend that any provision actually bars plaintiffs’ lawsuit. Instead, it contends that section 6901.5 clearly permits the allegedly unlawful conduct.
The plain text of the statute refutes the court’s thesis. Section 6901.5 says, in pertinent part: “When an amount represented by a person to a customer as constituting reimbursement for taxes due under this part is computed upon an amount that is not taxable or is in excess of the taxable amount and is actually paid by the customer to the person, the amount so paid shall be returned by the person to the customer upon notification by the Board of Equalization or by the customer that such excess has been ascertained. In the event of his or her failure or refusal to do so, the amount so paid, if knowingly or mistakenly computed by the person upon an amount that is not taxable or is in excess of the taxable amount, shall be remitted by that person to this state.”
In the sales tax scheme, this language establishes that “ ‘[i]f tax reimbursement in excess of the tax liability on a transaction is collected and paid to the State, the taxpayer has no further tax liability . . . .’ ” (Maj. opn., ante, at p. 1119.) But the fact that the retailer has no further tax liability does not mean it is immunized from liability under the consumer protection statutes. Remitting excess sales tax reimbursement to the state simply forestalls any tax dispute between the retailer and the Board. It does not forestall a dispute between the retailer and its customers over unlawful business practices. Plaintiffs in this case are not suing for a tax refund; they are suing to prevent and remedy misrepresentations that induce customers to reimburse Target for sales tax on transactions for which no sales tax is actually owed. The fact that Target may have reached a safe harbor with respect to any audit or enforcement action by the Board does not give Target permission to tell its customers *1140 that certain charges are sales taxes when in fact they are not. I do not see how section 6901.5 permits, much less “clearly permitfs]” (Cel-Tech, supra, 20 Cal.4th at p. 183), this conduct. Indeed, among the many arguments the Board makes in its amicus curiae brief urging dismissal of this suit, the Board nowhere contends that section 6901.5 provides an all-purpose safe harbor of the sort that today’s decision invents.
B.
The court’s more general argument is that allowing plaintiffs’ suit to go forward will undermine the orderly administration of the tax laws. The court relies on the familiar precepts, codified in article XIII, section 32 of the California Constitution and related statutory provisions, that only a taxpayer can seek recovery of an overpayment, that a taxpayer must first pay the tax before disputing it, and that a taxpayer seeking a refund must first exhaust administrative remedies before going to court. But plaintiffs’ lawsuit does not run afoul of these precepts because it is not a tax refund action. Nor is it an action to compel Target to seek a refund or claim a tax exemption, or to compel the Board to provide a refund, or to prevent or enjoin the Board from collecting any tax. This is an ordinary consumer action that seeks to remedy a retailer’s practice of misinforming consumers as to the taxability of particular sales.
Because the court cannot point to any law that actually bars this lawsuit or clearly permits the alleged misconduct, it must ultimately resort to considerations of policy. Thus, the court says that allowing this suit to go forward will lead to adjudication of tax questions “without the benefit of the Board’s expertise or its ability to conserve judicial resources by correcting error by means of administrative proceedings” (maj. opn., ante, at p. 1130), “could produce inconsistent judgments” between courts or between a court and the Board (ibid.), and “could threaten revenue collection and the ability of government to plan for expenditures” (id. at p. 1131). These concerns flow from the premise that the Board “would be absent” from any consumer litigation and thus will not have had any chance to reach its own determination on the taxability question before a court issues a judgment. (Id. at p. 1129.)
But there is a simple solution for this: In any civil action, a court “shall” join as a party a person who “claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.” (Code Civ. Proc., § 389, subd. (a).) Today’s opinion *1141 acknowledges that the Board is “a party considered by the Legislature to be necessary” in “a proceeding that would produce a binding interpretation of tax law.” (Maj. opn., ante, at p. 1129.) Why isn’t joinder of the Board an adequate response to the concerns that the court has identified?
There is no reason to think that the Board would be reluctant to participate as a party or that a court would be reluctant to join the Board. In this case, the Board has filed a lengthy amicus curiae brief defending its prerogative to decide the taxability question at issue. If plaintiffs’ suit were to go forward, presumably the Board would not hesitate to be joined as a party. Joining the Board would not run afoul of the state Constitution because plaintiffs do not seek “to prevent or enjoin the collection of any tax.” (Cal. Const., art. XIII, § 32.) In the course of the proceeding, the Board would provide its determination of when hot coffee to go is subject to sales tax, and the court would have the benefit of the Board’s expertise before rendering a judgment.
Suppose the court decides that Target has overpaid its taxes. Target would then be required to return any overcharges to its customers and to avoid future misrepresentations. Going forward, Target may choose to distinguish taxable from nontaxable sales of hot coffee, and it may seek a refund of any excess sales taxes it remitted to the Board. But Target need not do so if it believes the administrative costs outweigh the benefits. As noted, Target can elect to keep paying sales tax on all sales of hot coffee to go while passing the cost on to consumers by charging higher prices with a sign that says “all prices include applicable sales tax.” The decision whether to utilize an exemption or seek a refund is entirely up to Target. Further, plaintiffs have not sought any remedy from the Board, and the burden is on Target, not the Board, to initiate the refund process. (§ 6091.) I do not see how such a procedure would undermine the orderly administration of the tax laws any more than judicial review of a Board decision on the same question in an audit, deficiency determination, or refund action.
The court distinguishes Javor v. State Board of Equalization (1974) 12 Cal.3d 790 [117 Cal.Rptr. 305, 527 P.2d 1153] (Javor) on the ground that compulsory joinder of the Board in that case served to allow the “retailers to make refund applications to the Board” and to enable “the Board to respond to these applications by paying into court all sums, if any, due defendant retailers.” (Id. at p. 802; see maj. opn., ante, at pp. 1101, 1133.) But nothing in Javor indicates that this remedial approach is exclusive of all others. Today’s opinion, unlike Javor, leaves consumers who have been charged sales tax reimbursement on nontaxable sales with no judicial recourse at all, even as it makes no attempt to explain why joinder of the Board would not adequately protect the interests of the Board, retailers, and the public in the orderly administration of the tax laws.
*1142 Finally, the court says that “independent consumer claims against retailers for restitution of reimbursement charges on nontaxable sales could form a huge volume of litigation over all the fine points of tax law as applied to millions of daily commercial transactions in this state.” (Maj. opn., ante, at p. 1130.) This would be true only if consumers often had cause to suspect retailers of misrepresenting the applicability of the sales tax to particular items. But there is no reason to believe this is so. Before today’s decision, no authority foreclosed suits like this one, yet there is no indication that such suits are common. This case seems unusual because some sales of hot coffee are taxable while others are not. Neither the court, the Board, nor Target contends that a similar ambiguity affects the taxability of many other items. With no evident basis for concern, the court’s warning of a flood of litigation is a makeweight.
III.
This case is really quite straightforward. Plaintiffs allege an unlawful business practice that lies squarely within the broad language and policy objectives of the UCL and CLRA. No statute bars this action, and no law clearly permits the allegedly unlawful conduct. Plaintiffs’ suit implicates a taxability question. But judicial resolution of the question, with the Board joined as a party, presents no greater threat to the orderly administration of the tax laws than judicial review of a Board determination addressing the same question. The lengthy disquisition on our tax laws in today’s opinion suggests a category error: The court has mistaken an ordinary consumer action that involves a tax question for a tax refund suit that precludes an ordinary consumer action.
The court’s ruling, though erroneous, need not be read to broadly establish that a consumer action may never go forward if it involves a tax issue. This case implicates a rather arcane and complicated question of taxability. Future cases may implicate tax questions that are distinguishable from the one at issue here. In light of California’s strong legislative policy against deceptive business practices, courts should hesitate to expand the hole that today’s decision carves out of our consumer protection statutes.
Because of today’s ruling, we may never know when hot coffee to go is actually subject to sales tax because neither a retailer nor the Board has any incentive to resolve the issue. That in itself is no great travesty. But why should a retailer be allowed to misrepresent to consumers that all sales of a particular item are subject to sales tax when in fact they are not? A consumer who seeks her day in court to contest this misrepresentation is simply out of luck, while the retailer and the Board stay mum and mutually benefit.
*1143 Nothing in the tax laws or our precedents authorizes such a questionable arrangement, and our robust consumer protection statutes are not so easily defeated.
I respectfully dissent.
Werdegar, J., and Moore, J.,* concurred.

Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.