Filed 11/17/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JESSICA LOY et al., | B315313 |
| Plaintiffs and Respondents, | Los Angeles County Super. Ct. No. 19STCV45035 |
| v. | |
| TRINA KENNEY et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Barbara Marie Scheper, Judge. Affirmed.

Ewaniszyk Law Firm, Richard M. Ewaniszyk; Arias & Lockwood, Christopher D. Lockwood; Law Office of Donald W. Reid and Donald W. Reid for Defendants and Appellants.

Cotchett, Pitre & McCarthy, Gary A. Praglin, Theresa E. Vitale; Animal Legal Defense Fund, Isabel F. Callejo-Brighton and Christopher Berry for Plaintiffs and Respondents.

―――――――――――――

Dog buyers claimed a puppy mill victimized them.  They said the mill advertised online, negotiated by text, arranged parking lot meetups, insisted on cash, and sold underage puppies that sickened within one day and soon died.  The buyers alleged the mill was the Kenney family:  parents Trina and Rick and their children Jezriel and Elijah.  Nine buyers, joined by Caru Society for the Prevention of Cruelty to Animals, sued the Kenneys and moved for a preliminary injunction.  The trial court found the plaintiffs were likely to succeed in proving the Kenneys had violated several statutes, including the Consumers Legal Remedies Act.  (Civ. Code, § 1750 et seq. (the Act).)  One theory was false advertising:  it was wrong to represent the puppies were healthy when in truth they were not.  Pending trial, the court granted a preliminary injunction barring the Kenneys from advertising or selling dogs.

The Kenneys appeal the preliminary injunction.  As a group, they filed a single opening brief and a single reply:  they appeal as one group with a unified legal position.  We treat the four as a bloc.

The Kenneys' main complaint is no proof showed they were the ones selling these dogs.  The trial court was right, however, to reject this identity defense and to find the Kenneys were the dog sellers.  The court was also right to find likely harm to the public justified the preliminary injunction.  We affirm.

I

The dog buyers and Caru alleged the Kenneys sold puppies by representing them as healthy when in fact the puppies were sickly and soon died.  The Act allows damaged consumers to sue for an injunction if a seller represents goods have qualities they

2

do not have.  (Civ. Code, §§ 1770, subd. (a)(5), 1780, subd. (a)(2).)
The plaintiffs also alleged other theories against the Kenneys.

The buyers and Caru moved for a preliminary injunction
barring the Kenneys from advertising or selling dogs.  The
moving papers included declarations from three dog buyers:
Brandon Swigart, Jessica Loy, and Anthony Paradise.  Humane
Society Officer Frank Padilla described the history of
enforcement efforts against the Kenneys related to puppy sales.
The moving papers excerpted the Kenneys' depositions.

We detail some of this evidence in the next section.

## II

The Kenneys claim no admissible evidence supported the
injunction.

We use a deferential standard to review this claim.  We
affirm a decision about whether to grant a preliminary injunction
unless the decision is an abuse of discretion.  (*BBBB Bonding
Corp. v. Caldwell* (2021) 73 Cal.App.5th 349, 364 (*BBBB*).)  In
applying this standard, we review the record as a whole and
accept all evidence supporting the order.  We disregard contrary
evidence, we draw inferences in favor of the order, and we do not
reweigh evidence.  (*Schmidt v. Superior Court* (2020) 44
Cal.App.5th 570, 581.)  This holds for both implicit and explicit
factual findings.  Lack of specificity does not undermine a finding
if the record reveals rational support.  (*Letgolts v. David H. Pierce
& Associates, PC* (2021) 71 Cal.App.5th 272, 286.)  If supported
by substantial evidence, the trial court's findings govern our
review.  (*Schmidt*, at p. 582.)  We review the trial court's decision,
not its reasoning.  (See *Kokubu v. Sudo* (2022) 76 Cal.App.5th
1074, 1082.)  We review evidentiary rulings for abuse of

discretion.  (*Jane IL Doe v. Brightstar Residential Inc.* (2022) 76 Cal.App.5th 171, 176.)

A

The Kenneys' main factual complaint is about identity:  *we weren't the sellers.*  They say the buyers' declarations lacked proper evidentiary foundations to identify the Kenneys as the dog sellers.  The Kenneys maintain "*unidentified people" ran the puppy mill and sold those dogs*.

Overwhelming evidence demolishes this complaint.

1

We review the three declarations from buyers Swigart, Loy, and Paradise to pinpoint the issue.

a

Swigart declared he and his wife were searching for a type of puppy called a labradoodle.  Swigart texted the phone number listed in a Craigslist online ad picturing puppies for $1,250 each.

On February 2, 2019, the seller texted that "my son" could be at "a safe public place":  2700 E. Workman St., West Covina, CA 91791.  Swigart lived in Huntington Beach but was willing to drive to the West Covina address to buy the dog.  Swigart arrived and texted the seller that he and his wife were "here in the parking lot."  They waited for the seller for over an hour before texting, "We will wait another 15 [minutes] and then we are taking off."  The seller texted back, "Hi i am so sorry I don't know what happened he was suppose[d] to be there an hour ago!!!  I will try to get ahold of him but I'm still at work."  On account of the delay, the seller reduced the price to $1,200.

Swigart declared, "The seller's daughter ended up meeting us with the puppies instead of the seller's son."  The Swigarts paid the daughter $1,200 and took a dog home.

4

Once home, the Swigarts' new dog immediately fell mortally ill.  They took out a line of credit and paid about $9,000 in vet bills to try to save it.

On March 9, 2019, the vet euthanized the Swigarts' dog.  In the interim, the Swigarts washed the dog and discovered it had been dyed brown.

The Kenneys challenge the portion of Swigart's declaration where he stated, "We paid the seller's daughter, [whom] we later learned was Jezriel Kenney after seeing her photograph."  They say Swigart did not append this photograph and did not explain where he got it, which provided inadequate foundation.  This poses the identification issue about which the Kenneys appeal.

b

The Kenneys level a similar challenge to the declaration of Loy, who declared, "The seller, who I later learned was Trina Kenney, denied selling us Bear and then threatened me with a racial slur."  "Bear" is what Loy named the dog she and her family bought for $1,000 cash in the parking lot of a taco restaurant.  Loy bought the dog on the representation it was nine to 12 weeks old.  The dog sickened on the drive home and later died.  It had been dyed brown.

The Kenneys say Loy "provided no personal knowledge basis for contending the seller was Trina Kenney."  This again poses the identification issue.

c

The Kenneys make the same attack on the Paradise declaration.  Paradise swore he paid $1,800 cash for a dog he bought in a Starbucks parking lot.  The dog was advertised as eight weeks old.  "On May 1, 2020, we met the seller, Trina Kenney, and her minor daughter in the Starbucks parking lot

5

located at 101 Barranca Avenue, West Covina, California, 91791. Trina arrived in a brand-new Mercedes."

Paradise's new puppy died within days.

The Kenneys object that Paradise "stated no personal knowledge basis for contending the people he met are Trina Kenney or her daughter. This is speculation not based on personal knowledge."

## 2

Abundant proof supported the trial court's identity finding that it was the Kenneys who sold puppies to Swigart, Loy, and Paradise. The Kenneys' deposition testimony lavishly established their identity as puppy sellers: they sold puppies in the past, they had kennel facilities on the family property, and they had an elaborate puppy sale history with local humane society officials. Deposition testimony, together with the Padilla and buyers' declarations, also showed these particular sales fit the Kenneys' standard methods: dyed puppies, Craigslist, parking lots, and so on. There was no mystery about the Kenneys' identity as the dog sellers. We review this extensive proof.

### a

In her deposition, Trina Kenney admitted she did sell puppies.

When asked where she got the puppies she sells, Trina Kenney testified she bought them "off of Craigslist, buying and reselling. Recycler. Facebook. Sometimes word of mouth."

"Q: So you purchase the puppies yourself from somebody else and then you resell them?

"A: Yes, I have."

Trina Kenney suggested she resold puppies in as little as an hour.

"Q: So in the hour between when you obtain these pets, these puppies from a seller and then reselling them, do you ever vaccinate them?

"A: Of course.

"Q: So in a one-hour span you vaccinate these dogs?

"A: Yeah, it's really fast. Takes me like—seriously like 30 seconds to do one dog."

She said she provided vaccination records to puppy buyers "[i]f they ask for it." When asked "Have any of these vaccinations ever come from a veterinarian?", Trina Kenney answered, "No, not that I can recall."

b

Rick Kenney also admitted many relevant facts.

He admitted that "Animal Control has visited my Property unannounced numerous times to investigate complaints that my family is selling sick puppies."

He likewise admitted that in 2018 "Animal Control" assisted the Humane Society in seizing 32 dogs from his property on Daisy Lane in Phelan, California. The seizure was pursuant to a search warrant for "[a]ny and all dogs that appear sick."

The record contains a picture of Rick Kenney holding a small puppy. There likewise are photos of the Kenneys' Daisy Lane property showing an extensive block of outdoor kennel cages on a concrete pad. The kennel cages are tall and wide, in a contiguous line, and detached from other structures. Each cage is large enough to hold many dogs, and there are many cages.

c

Jezriel Kenney also made pertinent admissions.

She admitted that, during a raid for puppies, officials interviewed her regarding dogs. This raid and interview were at her father's house on Daisy Lane, where she then lived. Jezriel Kenney identified pictures of "the kennels at my dad's house" on Daisy Lane.

When asked whether she had ever heard her father had sold puppies, Jezriel Kenney answered, "I don't know. I don't think so. I don't know. I guess."

The wording of this answer creates a cascade of inferences.

Jezriel Kenney sold labradoodle puppies online through Craigslist.

When asked, "Did the Kenney family ever give puppies shots before selling them?", Jezriel Kenney answered yes. She personally had given injections to puppies: "It comes with two little vials, you mix them together and then you administer the shot to the puppy."

"Q: . . . So who fills out the vaccination record?

"A: If they're not filled out, then I usually let the people fill them out. I'll put the date that the puppy had the shot, but then the rest of the information is for the owner of the puppy.

"Q: So you're the person who writes in the information on the date that you gave the puppy the shot, right?

"A: If the puppy did not come with a record, then yes. Sometimes it's me, sometimes it's the person [whom] I get the puppy from.

"Q: And when you give a vaccine do you put some barcode or a label on the shot record so that the puppy owner can know what vaccine was given?

"A: Yeah, whatever it comes with you give them."

Jezriel Kenney did not keep records of shots she gave puppies.

d

Humane Society Officer Frank Padilla supplied information about the Kenneys' puppy business.

Padilla had worked for the Humane Society of San Bernardino Valley for 15 years. In about 2012, his office began receiving complaints about online sales of sick and underage puppies and set up an undercover buy. Siblings Jezriel and Elijah Kenney showed up at the arranged locale with two puppies. The two Kenneys claimed they had been dropped off to make the sale. They ran away without the puppies while the officer waited for the sheriff's department to arrive. The officer seized the dogs and later got a call from a man saying he was Rick Kenney, father of Jezriel and Elijah Kenney. The office's investigation revealed the family included father Rick Kenney, his wife Trina Kenney, and their children Jezriel and Elijah. (A third child is not involved in this appeal.) The children were minors at the time, and the adults were using their minor children as fronts to make the sales.

In 2014, Padilla's office was involved in another sting against the Kenneys. A person bought a puppy from Rick Kenney, and the puppy turned out to be sick. The disgruntled buyer gave Padilla's office a picture of Rick Kenney holding a puppy. Padilla's office set up another sting. Rick Kenney arrived in the car with his five-year-old daughter, who is not involved in this case. The child got out of the car to deliver the puppy but then Rick Kenney—apparently sensing the operation was a sting—drove off and left his five year old in the parking lot.

9

In 2017, Padilla set up another sting on the Kenneys in Rancho Cucamonga. Padilla's office responded to a Craigslist ad for a puppy, and the Kenneys set a location for the sale. The entire Kenney family arrived. Rick Kenney sent his daughter Jezriel out of the car with the puppy to meet the buyer. Officers arrested Rick Kenney for driving on a suspended license and took him to jail in handcuffs. The officers cited Trina Kenney for doing business without a license.

In 2018, officers executed a search warrant on the Kenneys' Daisy Lane property and arrested Rick Kenney for being a felon in possession of a firearm. The Humane Society seized 32 puppies and dogs. Padilla saw the living conditions for the animals were "unhealthy and cruel."

In the garage, Padilla found a litter of 10 puppies of age six to eight weeks. The mother dog was not there, and the puppies were encrusted with feces and diarrhea. There was no food or water there, and Padilla found no dog or puppy food anywhere on the property. Padilla confiscated the puppies for their safety but within hours they showed symptoms of Parvo virus and several had to be euthanized. Parvo is very contagious and can spread easily to puppies and dogs with immune problems. The virus does not show symptoms for the first few days, but the infected animals can spread the disease. It then is difficult to sterilize the dogs' area. Padilla declared the "lack of drains and the contamination of the dirt observed around the Kenney kennels would make it nearly impossible to get rid of the virus."

One of the few puppies to survive turned from brown to white when bathed, showing the dog's fur had been dyed.

The search of the Daisy Lane property turned up hair dye and vaccination records but no vaccines and no syringes. Officers

seized six computers and cell phones.  Software on the smart phones allowed the user to generate additional numbers to send and receive texts.  The software "gives you the ability to change numbers as many times as needed and start with new numbers again."

During the search, Trina Kenney said words to the effect that "you will not stop us from selling puppies."

e

The Kenneys objected to the Padilla declaration in the trial court on the grounds it was improper character evidence.  The trial court overruled this objection because the "evidence is being offered to demonstrate the identity of the sellers as Defendants, as well as opportunity, intent, and a common plan.  (Evid. Code, § 1101; see e.g., *People v. Edwards* (2013) 57 Cal.4th 658, 713.)"

On appeal, the Kenneys by omission abandon their character evidence objection:  their opening brief cites neither Evidence Code section 1101; *People v. Edwards* (2013) 57 Cal.4th 658; nor any other character evidence authority.  They thus forfeit this ground.  They likewise have forfeited other appellate objections to the Padilla declaration because they failed to raise these objections in the trial court.  (See Evid. Code, § 353.)

3

This proof destroys the Kenneys' complaint about the foundational adequacy of the declarations concerning identity.  Assuming for argument's sake there were foundational errors in the buyers' declarations, these assumed errors were harmless because a mass of other evidence supported the trial court finding that, by a preponderance, the Kenneys were the sellers.

11

## B

The Kenneys' second evidentiary objection attacks proof the puppies had been dyed brown. This objection is insubstantial. Loy declared she bathed her dog and it turned from brown to white: "the brown coloring came out in the bath and his coat was actually an off-white color." This report was a firsthand observation. Padilla also found hair dye at the Kenney home on Daisy Lane.

## C

The Kenneys' other evidentiary objections are immaterial. They condemn the foundation for the declarations' statements about which disease killed each dog, the age of the dogs, and whether vaccination records were falsified.

These other statements are immaterial because they were unnecessary to the trial court's analysis, which was valid.

The trial court accurately recounted the law. It evaluated two interrelated factors: the likelihood the plaintiffs would prevail on the merits at trial, and the interim harm likely to be sustained if the injunction were denied compared to the harm the defendants likely would suffer if it were granted. (*BBBB*, *supra*, 73 Cal.App.5th at p. 364.) The trial court found the plaintiffs were likely to prevail on the merits, and the balance of harms favored the injunction. Whether the puppies died of Parvo virus or some other disease, for instance, does not matter.

Substantial evidence supported the plaintiffs' probability of success. The Act prohibits selling goods that are not as advertised. (Civ. Code, § 1770, subd. (a)(5).) The trial court had an ample basis for concluding the Kenneys had represented the puppies were healthy when in fact they were not: all rapidly died.

When the puppies you sell immediately get sick and die, the plaintiffs at trial probably will be able to show your claims about good health were false. That is all the Act requires in this situation. The puppies' age and so forth does not affect this analysis.

On the second prong, the trial court correctly balanced the harms. The court noted the Kenneys offered no proof a preliminary injunction would cause them irreparable harm. This is understandable. The Kenneys put themselves in an intractable situation by pursuing an identity defense: difficulties arise when people insist "we are not doing that, but if you stop us from doing that it will cause us serious problems."

The trial court properly found the *public* would be harmed if the Kenneys continued selling unhealthy dogs to other families seeking pets.

Swigart, Loy, and Paradise functioned as private attorneys general, seeking an injunction against future deceptive practices on behalf of the general public. The Act's injunctive relief provision is not to resolve private disputes but to remedy a public wrong. The benefits of granting injunctive relief accrue to the general public in danger of being victimized by the same deceptive practices these buyers suffered. (See *Broughton v. Cigna Healthplans of California* (1999) 21 Cal.4th 1066, 1079–1080.)

The trial court had a basis for finding the Kenneys posed a continuing menace to the public at large. The preliminary proof was that the Kenneys persisted in their routine. As Humane Society Officer Padilla reported, Trina Kenney said, "[Y]ou will not stop us from selling puppies." As a preliminary remedy pending trial, closing this puppy mill was in the public interest.

13

### III

The parties raise other issues we need not and do not reach. They discuss other theories of liability that supplement the Act. These are unnecessary to our holding. Nor need we address whether Caru alone had standing to bring this case. The preliminary injunction is valid irrespective of whether Caru is in or out of the case. For purposes of this appeal, Caru is just a spare plaintiff. No one argues otherwise. We express no view on the merits of these ancillary issues.

### DISPOSITION

We affirm and award costs to respondents.


WILEY, J.


We concur:



STRATTON, P. J.



GRIMES, J.

14